604 So.2d 440 (1992)
Northern PALM BEACH County Water Control District, Etc., Appellant,
v.
State of Florida, etc., Appellee.
No. 77098.
Supreme Court of Florida.
June 16, 1992.
Charles F. Schoech of Caldwell & Pacetti, Palm Beach, and Anne Longman and Terry E. Lewis of Messer, Vickers, Caparello, Madsen & Lewis, P.A., Tallahassee, for appellant.
David H. Bludworth, State Atty. and Leslie M. Ritch, Asst. State Atty., Fifteenth Judicial Circuit, West Palm Beach, for appellee.

CORRECTED OPINION
PER CURIAM.
This is an appeal from a final judgment which declined to validate water control and improvement bonds proposed to be issued by the Northern Palm Beach Water Control District (District). We have jurisdiction pursuant to article V, section 3(b)(2) of the Florida Constitution, and chapter 75, Florida Statutes (1989).
The District is a drainage district organized and existing under chapter 59-994, Laws of Florida, as amended and supplemented by chapter 89-462, Laws of Florida, and the applicable provisions of chapter 298, Florida Statutes (1989). The District sought validation of water control and improvement bonds to finance on-site road improvements in Unit of Development No. 31 (Unit 31), a unit of the District created for the purpose of draining and reclaiming the land located within the unit. The Unit 31 site, also known as Ballen Isles of the JDM Country Club, is being developed by Hansen-Florida II, Inc., and will include single family residences, multifamily housing, park areas, and three golf courses.
The Circuit Court of the Fifteenth Judicial Circuit appointed three commissioners to prepare a report regarding the District's water management plan for Unit 31. The commissioners' report determined that the estimated cost of the improvements would be less than the benefits assessed against the lands in Unit 31. The report distinguished between two separate components *441 of the planned improvements. The first component improvements, consisting of the water management system, the water and sewer facilities, and exterior road improvements, are not at issue here. The Program Two improvements, which are the subject of this appeal, include interior or on-site road improvements such as paving, striping, signs, landscaping, irrigation, bridges, an overpass, culverts, street lighting, security gatehouses, and a secondary drainage system consisting of storm drain pipes, inlets, manholes and surface drainage. The commissioners' report assessed the benefits of the Program Two improvements to be $18,125,000. The circuit court entered an order approving and confirming the report.
In December 1989, the Board of Supervisors of the District adopted a general bond resolution which authorized the issuance of Water Control and Improvement Bonds, Unit of Development No. 31, Program Two, in a principal amount not to exceed $16,312,500. The bond resolution provided that the bonds "shall not be general obligations or indebtedness" of the District, but instead are "special obligations payable solely" from, and secured by, a first lien and pledge of the proceeds of the drainage tax levied on the lands in Unit 31. In March 1990, the Board of Supervisors adopted a resolution levying a $42,625,000 drainage tax on the lands in Unit 31 in proportion to the benefits to be derived from the construction of the Program Two improvements. The amount levied consisted of an initial assessment of $18,125,000, plus the $24,500,000 interest estimated to accrue on the bonds.
After the bond validation hearing, the circuit court entered a final judgment which declined to validate the bonds because "[t]he intended use of the proceeds of this bond issue serves no valid public purpose." The final judgment also stated that the District failed to comply with its enabling legislation because it "did not meet the requirements of the Safe Neighborhoods Act, as enumerated in Sections 163.501-163.522, Florida Statutes."
The scope of judicial inquiry in bond validation proceedings is limited to the following issues: 1) determining if the public body has the authority to issue the bonds; 2) determining if the purpose of the obligation is legal; and 3) ensuring that the bond issuance complies with the requirements of law. Taylor v. Lee County, 498 So.2d 424 (Fla. 1986). Only two questions are presented for our consideration here: 1) whether the revenue bond proceeds will be used for a valid public purpose, and 2) whether the District has complied with the requirements of its enabling legislation in issuing the bonds.
As to the first issue, the State contends that these bonds violate article VII, section 10 of the Florida Constitution, which prohibits the District from using its taxing power or pledging public credit to aid private enterprise, and that no valid public purpose can be served by financing the construction of roadways within a private development where public access will be limited by security gatehouses. The District asserts that in enacting chapters 59-994 and 89-462 the legislature found a public purpose in designating roads for the exclusive use and benefit of a unit of development and its residents.
Article VII, section 10[1] of the Florida Constitution prohibits the state and its subdivisions, including special districts such as this water control district, from using its taxing power or pledging public credit to aid any private person or entity. However, if the project falls within one of the four subsections of article VII, section 10, then no constitutional prohibition is involved. See Linscott v. Orange County Indus. Dev. Auth., 443 So.2d 97 (Fla. 1983). The on-site road improvements planned for Unit 31 do not fall within these four subsections. Thus, in order to determine if the bonds run afoul of the constitution, we must first *442 determine whether the District's taxing power or pledge of credit is involved. If either is involved, then the improvements must serve a paramount public purpose. See Orange County Indus. Dev. Auth. v. State, 427 So.2d 174 (Fla. 1983). However, if we conclude that neither is involved, then the paramount public purpose test is not applicable and "it is enough to show only that a public purpose is served." Linscott, 443 So.2d at 101.
Section 298.36(1), Florida Statutes (1989), authorizes the board of supervisors of a water control district to "levy a tax" in proportion to the benefits to be derived from the works and improvements of the district. The District's resolution also refers to the assessment as a "drainage tax." However, we find that a special assessment rather than a tax is at issue in this case. See Lake Howell Water & Reclamation Dist. v. State, 268 So.2d 897 (Fla. 1972). As this Court explained in City of Boca Raton v. State, 595 So.2d 25, 29 (Fla. 1992), "there is no requirement that taxes provide any specific benefit to the property... . [But] special assessments must confer a specific benefit upon the land burdened by the assessment." We also noted that special assessments must be "reasonably apportioned among the properties that receive the special benefit." Id. Because this is a special assessment, rather than a tax, no use of the District's taxing power is involved. Moreover, the general bond resolution provides that the District cannot be compelled to exercise its taxing power in order to pay the bonds.
The resolution further provides that the bonds "shall be special obligations payable solely" from the drainage assessments to the landowners for the Program Two improvements, and that the bonds "shall not constitute a lien upon any of the facilities or properties" of the District. "Where there is no direct or indirect undertaking by the public body to pay the obligation from public funds, and no public property is placed in jeopardy by a default of the third party, there is no lending of public credit." State v. Housing Fin. Auth., 376 So.2d 1158, 1160 (Fla. 1979); see also Nohrr v. Brevard County Educ. Facilities Auth., 247 So.2d 304 (Fla. 1971). Thus, the bonds do not contemplate a pledge of the District's credit. Because neither the District's taxing power nor a pledge of its credit is involved here, the bonds need only serve a public purpose rather than a paramount public purpose. See Linscott, 443 So.2d 97.
Chapter 59-994 created the District and imbued it with a number of powers, including the authority to "issue negotiable or other bonds" and "to construct, improve, pave and maintain roadways and roads" needed to access and develop those areas which are made suitable for settlement and development as a result of the operations of the District. Ch. 59-994, § 3, Laws of Fla. Chapter 89-462 empowered the District to construct roads "for the exclusive use and benefit of a unit of development and its landowners, [and] residents," to "finance and maintain said roads and their associated elements as part of a water management plan," and to "construct and maintain security structures to control the use of said roads." Ch. 89-462, § 6, Laws of Fla. Chapter 298, Florida Statutes (1989), also authorizes water control districts to issue bonds to pay for the costs of proposed improvements. See, e.g., §§ 298.36(2), 298.47, Fla. Stat. (1989). This enabling legislation evidences a clear legislative expression that the on-site controlled-access roads at issue in this case serve a valid public purpose. In addition, the District's Board of Supervisors adopted a resolution stating that the designation of roads for the exclusive use and benefit of Unit 31 is a public purpose "in the best interest of the health, safety, and general welfare of these areas and their inhabitants, visitors, property owners and workers." This Court has stated that a legislative declaration of public purpose is presumed to be valid, and should be deemed correct unless so clearly erroneous as to be beyond the power of the legislature. Nohrr, 247 So.2d 304. Although these legislative expressions of public purpose are not controlling, they are "entitled to great weight." State v. Leon County, 400 So.2d 949, 951 (Fla. 1981).
*443 As to the public purposes actually served by these bonds, we note that the roadway improvements at issue will provide access to the water management facilities and aid in the development of the reclaimed lands. However, the fact that public access to the roads will be limited raises a question of whether the stated public purposes are only incidental to a primary private purpose, the development of Unit 31 by Hansen-Florida II, Inc. "A broad, general public purpose ... will not constitutionally sustain a project that in terms of direct, actual use, is purely a private enterprise." Orange County, 427 So.2d at 179. In Orange County, the Court found that the expansion of a television station's broadcast facilities did not serve a paramount public purpose even though the public would receive a number of benefits from the proposed expansion. However, the Court also noted that the presence of public ownership would be a significant factor in a finding of public purpose. Id.
In this case, the District will retain ownership of the roadways in question. This public ownership coupled with the legislative declaration of public purpose contained in the District's enabling legislation leads us to the conclusion that the on-site road improvements serve a public purpose. Thus, the proposed water control and improvement bonds are not prohibited by article VII, section 10 of the Florida Constitution.
As to the second issue, the State contends that the District failed to comply with its enabling legislation by not meeting the requirements of the Safe Neighborhoods Act, sections 163.501-163.522, Florida Statutes (1989).[2] Thus, the State contends that the District did not have the authority to issue the bonds. The District argues that compliance with chapter 163 is a collateral issue outside the scope of the bond validation hearing.
In light of the legislature's 1991 amendment of the District's enabling legislation, we need not address these arguments. Chapter 91-408, section 2, Laws of Florida, declares the inclusion of "provision in a water management plan for roads for the exclusive use and benefit of a unit of development and its residents" to be a "public purpose" and deletes reference to the Safe Neighborhoods Act.
Accordingly, we reverse the final judgment and remand with directions that the bond issue be approved.[3]
It is so ordered.
OVERTON, BARKETT, GRIMES and HARDING, JJ., concur.
SHAW, C.J., dissents with an opinion, in which KOGAN, J., concurs.
McDONALD, J., dissents.
SHAW, C.J., dissenting.
The majority opinion trips lightly over the matter of how public financing of the construction and beautification of a private country club roadway serves a valid public purpose within the purview of article VII, section 10, Florida Constitution. I would affirm the trial court's judgment invalidating the bonds.

I. FACTS

A. Private Country Club

The Northern Palm Beach Water Control District ("District"), a public drainage district of the State of Florida, proposes to issue $16,312,500 in government revenue bonds to pay for the construction and maintenance of approximately 24,000 feet of roadway within Unit of Development No. 31, otherwise known as the JDM Country Club ("Club"), a planned 1,313-acre private golf and tennis club. The District's Board of Supervisors ("Board") adopted a formal *444 Water Management Plan ("Plan") for the Club, which provides in part:
The Unit 31 site, known as JDM Country Club, is being developed as a Planned Community District under the procedures and requirements of the City of Palm Beach Gardens Code of Ordinances. The development will include [2,384 single family dwelling units], park areas and three golf courses.
The homes within the Club will occupy prime residential sites abutting, or lying in close proximity to, the fairways and greens of the three golf courses and, according to Paul Urschalitz, the District's security expert, will vary in price from a quarter-million to over a million dollars apiece:
Q. Would you anticipate looking at the type homes  did you have a chance to get an idea of what type of homes they're going to put in there?
A. Yes.
Q. What type of price range homes did you look at?
A. I think they're listed in this document, two hundred and fifty thousand to over a million... .
In addition to the roadway itself, the District will pay for extensive roadway improvements within the Club. Tracy Bennett, the District's engineer, testified:
The onsite roadway improvements include paving of the roadways, the striping, the signage, landscaping with the roadways, irrigation to maintain the landscaping and sodding, bridges, an overpass, culverts, street lighting, security gatehouses, and secondary drainage system consisting of storm drainage pipes, inlets, manholes and surface drainage.

B. "Caribbean Island" Motif

The District's Plan calls for extensive roadside landscaping paid for by the District to enhance the private Club's "Caribbean Island" theme.
Extensive landscaping within the onsite roadway rights-of-way system is planned... . The overall theme of the development is to provide a Caribbean Island effect. Strong emphasis in the roadway planting will be on various palm species 20 to 30 feet high with a full-canopied backdrop, accented with dwarf palms and a wide variety of blooming groundcover plants. The remaining open areas will be sodded. The most intensive landscaping treatment is the median, followed by right-of-way adjacent to a development parcel, then right-of-way adjacent to lake open areas... .
According to the Plan,[4] the initial cost to the District of this garden-like landscaping is vast. The Plan states:

 Estimated Costs of Improvements for Unit of Development No. 31
 ... .
 III. Roadway Improvements
 A. Onsite [Roads] $5,705,000
 B. Landscaping Onsite
 Roads $5,803,000

Thus, the District, a public entity, will pay nearly six million dollars in initial roadside landscaping costs  more than the cost of the entire roadway itself  to promote the private Club's "Caribbean Island" motif. This amounts to almost one and one-half million dollars of landscaping per mile of proposed roadway for the private Club.

C. Security Gatehouses

In addition to the "Caribbean Island" landscaping and other improvements noted above, the District will also pay for the construction and maintenance of three gatehouses to be staffed by security personnel to block all public access to the private Club. The District's official Plan provides:
In addition, the Board of Supervisors has the power to provide, control ingress and egress, and maintain roads for the exclusive use and benefit of a Unit of Development and its landowners, residents and invitees.
... .
The onsite roadway system [is] planned for the exclusive use and benefit *445 of [the Club] and its landowners, residents, and invitees... .
Peter Pimental, executive director of the District, testified as follows:
A. Want me to explain? What we proposed to do is construct these gatehouses as Mr. Bennett testified and with those gatehouses would be the security people who would control the ingress and egress to the project and those people or persons who have reason to be inside would be allowed inside the project. Those that have no purpose or no reason to be there, will not be permitted to just wander through the project.
Q. How would you define reason to be there?
A. There would be service directed, service oriented persons, residents, invitees, guests, police, fire, emergency service, all of those would have access to the project.
Q. So if I was out on a Sunday afternoon driving around, just wanted to ride through the District, I would be restricted under your rules?
A. Yes.
Q. So it is not open to the public at all?
A. Perhaps not... .
Thus, all on-site improvements within the Club  including the landscaping and roadway itself  that are paid for by the public District will be closed to the general public.

D. Financing

To pay for the District's proposed on-site improvements within the Club, the Board adopted a general bond resolution that authorizes issuance of Water Control and Improvement Bonds in a principal amount not to exceed $16,312,500. The resolution provides that the bonds shall not be general obligations or indebtedness of the District, but shall instead be special obligations payable solely from, and secured by, a first lien and pledge of the proceeds of a drainage tax levied on the lands of the Club. The Board subsequently adopted a resolution levying a $42,625,000 drainage tax on the lands of the Club in proportion to the benefits to be derived from the construction of the improvements. The tax, which consists of an initial assessment of $18,125,000 plus $24,500,000 interest expected to accrue on the bonds, will be paid solely by the landowners within the Club. The landowners will thus ultimately foot the bill for the District's proposed roadway improvements within the Club.
The bonds will be issued in the denomination of $5,000, or multiples thereof, will mature within 30 years, and significantly, will pay interest periodically (twice a year) from the District to bondholders at a rate to be determined later. In paying this interest, the Board covenants that it will comply with specific requirements of the federal tax code concerning the tax status of certain government bonds. These provisions, which are designed to stimulate funding for public projects, specify that interest payments by state and local governments to their investors may be tax-exempt for the investors. The Board's bond resolution states:
Section 4.08. Compliance with Tax Requirements. The Issuer hereby covenants and agrees, for the benefit of the Owners from time to time of the Bonds, to comply with the requirements applicable to it contained in Section 103 and Part IV of Subchapter B of Chapter 1 of the Code and to the extent necessary to preserve the exclusion of interest on the Bonds from gross income for federal income tax purposes.
Because the District's interest payments to bondholders will be tax-exempt for the holders, the bonds will be readily marketable even though the District may offer the bonds at an interest rate substantially below that of privately-issued, taxable securities. This reduced interest rate will minimize the District's financial obligations to bondholders and the resulting tax obligations of the Club's landowners.

II. THE APPLICABLE LAW
In Taylor v. Lee County, 498 So.2d 424, 425 (Fla. 1986), Justice McDonald explained the nature of this Court's inquiry in bond validation proceedings:

*446 The scope of judicial inquiry in bond validation proceedings is limited. Specifically, courts should: 1) determine if a public body has the authority to issue the subject bonds; 2) determine if the purpose of the obligation is legal; and 3) ensure that the authorization of the obligations complies with the requirements of law.
In the present case, we are concerned primarily with whether the purpose of the District's bonds is legal.
Article VII, section 10, Florida Constitution, bars governments within Florida from using their taxing power or credit to aid private corporations or persons:
SECTION 10. Pledging credit.  Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person....
The purpose of section 10 is to prevent state government from using its vast resources to monopolize,[5] or otherwise "destroy,"[6] a segment of private enterprise, and also "to protect public funds and resources from being exploited in assisting or promoting private ventures when the public would be at most only incidentally benefited." Bannon v. Port of Palm Beach Dist., 246 So.2d 737, 741 (Fla. 1971). To pass constitutional muster, a government bond issue must serve a truly public purpose, i.e., it must bestow a benefit on society exceeding that which is normally attendant to any successful business venture.[7]
During the pendency of the present case and immediately prior to oral argument before this Court, the legislature amended chapter 89-462, section 6, Laws of Florida, which concerns the Northern Palm Beach County Water Control District, to provide that restricted roadways serve a public purpose.
Section 6. Roads for exclusive use and benefit of a unit of development and its residents.  It is hereby found and declared that among the many causes of deterioration in residential neighborhoods are the proliferation of crime, excessive automobile flow, and excessive noise levels from automobile traffic. It is to the benefit of the land in the district and its ultimate users and residents and it is hereby declared to be a public purpose to include provision in a water management plan for roads for the exclusive use and benefit of a unit of development and its residents. Therefore ... the district has the power to adopt by resolution, a water management plan for a unit of development, that will permit the district to exercise the following powers:
(1) To provide roads for the exclusive use and benefit of a unit of development and its landowners, residents and invitees to control ingress and egress.
... .
(3) To construct and maintain security structures to control the use of said roads.
Ch. 91-408, § 2, Laws of Florida (emphasis and strike-through omitted).

III. CONCLUSION
Simply designating a project "public" by legislative fiat does not necessarily make it *447 so, especially where uncontroverted facts attest otherwise. A quote from Lewis Carroll makes the point:
"I don't know what you mean by `glory,'" Alice said.
Humpty Dumpty smiled contemptuously. "Of course you don't  till I tell you. I meant `there's a nice knock-down argument for you!'"
"But `glory' doesn't mean `a nice knock-down argument,'" Alice objected.
"When I use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean  neither more nor less."
"The question is," said Alice, "whether you can make words mean so many different things."
"The question is," said Humpty Dumpty, "which is to be master  that's all."
Lewis Carroll, Through the Looking Glass 113 (Dial Books for Young Readers, NAL Penguin, Inc. 1988) (1872). Under our constitutional system of government in Florida, courts, not legislators or water control districts, are the ultimate "masters" of the constitutional meaning of such terms as "public purpose" in judicial proceedings.
While a restricted roadway may serve a valid public purpose under certain circumstances, I conclude that no reasonable and sufficient public purpose is served by issuance of government bonds to finance the construction and landscaping of roadways within the private JDM Country Club. The extraordinarily expensive roadside landscaping to enhance the "Caribbean Island" motif of the private residences and golf courses within the Club would serve virtually no reasonable public purpose even if the Club were to be open to the general public. The fact that security gatehouses will be erected for the sole purpose of barring the public from the premises renders any alleged benefit to the public from the landscaping or roadway moot.[8]
It is perfectly clear to me that the District's bond project serves a simple, very private, purpose. It allows the owners of the proposed 2,384 residences within the Club to capitalize on a massive tax-break, intended for public projects, in financing the construction of a luxurious environment for their own private use. The undertaking smacks of state-sponsored, economic apartheid. I can conceive of few more private projects.
Rather than relying on an eleventh hour legislative declaration of public purpose and this Court's own examination of a cold record, I would place great weight on the reasoned judgment of the respected trial judge, for he alone had the opportunity to personally observe  on both direct and cross-examination  the demeanor of many of the Club's main functionaries, and he is far more familiar with the local circumstances surrounding this issue. Sufficient competent evidence supports his ruling.
I would affirm the trial court's judgment invalidating the bonds.
NOTES
[1] Article VII, section 10 of the Florida Constitution provides in pertinent part:

Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person... .
[2] The District's enabling legislation provides in pertinent part:

It is to the benefit of the land in the district and its ultimate users and residents to include provision in a water management plan pursuant to and in furtherance of the Safe Neighborhoods Act, ss. 163.501-163.522, Florida Statutes, for roads for the exclusive use and benefit of a unit of development and its residents.
Ch. 89-462, § 6, Laws of Fla. (emphasis added).
[3] We do not pass upon the economic desirability of these bonds, but only upon whether they may be legally issued. See, e.g., State v. City of Sunrise, 354 So.2d 1206 (Fla. 1978).
[4] Two-page Exhibit No. 12 of the Plan, which detailed "Roadway Plantings," was omitted from the appendix to the District's brief.
[5] See Adams v. Housing Auth., 60 So.2d 663, 669 (Fla. 1952).
[6] See State v. Town of North Miami, 59 So.2d 779, 785 (Fla. 1952).
[7] This Court has used a myriad of terms in assessing the sufficiency of public purpose in revenue bond proceedings. See, e.g., State v. City of Orlando, 576 So.2d 1315, 1317 (Fla. 1991) ("a paramount public purpose," and "a valid [public] purpose"); State v. City of Panama City Beach, 529 So.2d 250, 256 (Fla. 1988) ("valid [public] purposes"), receded from on other grounds, 576 So.2d 1315 (Fla. 1991); Linscott v. Orange County Indus. Dev. Auth., 443 So.2d 97, 101 (Fla. 1983) ("a public purpose"); Orange County Indus. Dev. Auth. v. State, 427 So.2d 174, 179 (Fla. 1983) ("paramount public purpose"); State v. Miami Beach Redevelopment Agency, 392 So.2d 875, 886 (Fla. 1980) ("some substantial benefit to the public"); State v. Housing Fin. Auth., 376 So.2d 1158, 1160 (Fla. 1979) ("if the public interest, even though indirect, is present and sufficiently strong," and "a reasonable and adequate public interest"); Nohrr v. Brevard County Educ. Facilities Auth., 247 So.2d 304, 309 (Fla. 1971) ("a public purpose").
[8] I disagree with the majority's conclusion that because the District will retain ownership of the proposed roadway this demonstrates the existence of sufficient public purpose. To my mind, public ownership of the roads is meaningless if the roads are reserved for the exclusive use of the private country club residents and guests. The fact that the roads will provide some service access to water management facilities within the Club evinces no reasonable public purpose when those facilities exist for the sole benefit of private Club residents.