650 So.2d 14 (1995)
STATE of Florida, Appellant,
v.
FLORIDA DEVELOPMENT FINANCE CORPORATION, a public body corporate and politic in the State of Florida, Appellee.
No. 84683.
Supreme Court of Florida.
February 9, 1995.
Willie N. Meggs, State Atty. and C.W. Goodwin, Asst. State Atty., Second Judicial Circuit, Tallahassee, for appellant.
Frank Scruggs of Steel, Hector & Davis, Miami, for appellee.
PER CURIAM.
We have on appeal a decision of the trial court validating evenue bonds issued by the Florida Development Finance Corporation. We have jurisdiction. Art. V, § 3(b)(2), Fla. Const.
*15 The Florida Development Finance Corporation Act of 1993, section 288.9602, et seq., Florida Statutes (1993),[1] was established to enhance Florida's economic activity and increase the purchasing power and employment opportunities for Florida citizens by attracting business enterprise, especially small business, to the state. Specifically, the Act encourages the provision of financing to businesses on terms that are competitive with those available in most developed financial markets. § 288.9602(2), Fla. Stat. To achieve the public purposes set forth in the Act, the legislature created the Florida Development Finance Corporation (FDFC). FDFC, once activated as provided for in section 288.9604, became a corporate and political entity and an instrumentality of local government. FDFC has the power to function within the corporate limits of any public agency with which it enters an interlocal agreement pursuant to the Florida Interlocal Cooperation Act of 1969, for any of the purposes of the 1993 Act. § 288.9604, Fla. Stat. In addition to this implied power, section 288.9605(2)(f) expressly authorizes FDFC to issue revenue bonds for the purpose of financing and refinancing capital projects. The legislature expressly provided that the bonds shall be deemed to have been issued for a public purpose. § 288.9609(2), Fla. Stat. Sections 288.9606 through 288.9608 set forth the procedures for authorizing, issuing, and guaranteeing those bonds.
An applicant seeking to acquire a guaranty of the bonds issued by FDFC must submit a guaranty application, pay a premium to the guaranty fund established pursuant to section 288.9607, give a first mortgage in the property to be financed, and provide a personal guarantee from the principal owner of the business being financed. If the application is approved, FDFC and the applicant enter a guaranty agreement under which FDFC guarantees to meet amortization payments on the bonds as they become due if the applicant is unable to make the payments as required by the bond indenture and the bondholder's trustee.
FDFC's guarantee, however, is limited. According to section 288.9607(7)(c), the guaranty agreement is a special rather than a general obligation and does not constitute an indebtedness of FDFC, the State, or any political subdivision thereof within the meaning of any constitutional or statutory limitation. Instead, FDFC's guaranty obligation can be satisfied only as mandated by law. Pursuant thereto, FDFC's obligation is limited to the funds provided for in the investment agreement which the Department of Transportation (the Department), Board of Administration (the Board), and FDFC entered into on June 1, 1994, in accordance with section 288.9607(7).
In accord with the instruction provided in the enabling statute, the three bodies produced an agreement establishing the following funding scheme. As the first source of funds to be used to satisfy the guaranty obligation, the Department, the Board, and FDFC created the Debt Service Reserve Account. See §§ 288.9607(7)(a)5 and 288.9608(1), Fla. Stat. When each bond is issued and sold, FDFC must deposit from the bond proceeds into the debt service reserve account an amount equal to not less than six months' maximum debt service requirement.[2] When FDFC makes a loan to *16 an applicant from the proceeds of a bond sale, FDFC must place the six months' maximum debt service reserve requirement into the applicant's own subaccount within the debt service reserve account. Those proceeds as well as any amount deposited in the subaccount from the proceeds realized by FDFC from the enforcement, collection, foreclosure, liquidation, and other realization with respect to any collateral security for the applicant's loan, shall be available to satisfy any obligation on the bonds which may arise by reason of the nonpayment of a loan. Any amount transferred to a subaccount shall be deemed to constitute an advance of the loan to the applicant by FDFC in an amount equal to the deposit.
The revenue bond guaranty reserve account (guaranty fund) serves as an additional source of security. See §§ 288.9607(7)(a)6, 288.9608(3)(c). Within this account are the FDFC bond guaranty reserve account and the supplemental bond guaranty reserve account. When bonds are issued and sold, the investment agreement provides that FDFC shall deposit in the FDFC bond guaranty reserve account an amount which is not less than one year's maximum debt service requirement. The deposit will come from sources other than the investment of earnings accrued and collected upon the investment of the minimum balance of funds required to be maintained in the State Transportation Fund. Those proceeds, as well as any amount deposited after the date of issuance of the bonds which have been designated by FDFC as available for the payment and performance of the obligations and agreements of FDFC under the bond guaranty, are available for payment of the bonds if the funds in the debt service reserve account are insufficient to cover the amortization payments.
Finally, the investment agreement provides, pursuant to sections 288.9607 and 288.9608, for the supplemental bond guaranty reserve account containing proceeds of any investment of transportation trust fund earnings.[3] If FDFC is unable to discharge its obligations under the bond guaranty with the funds from other accounts, then subject to the terms of the investment agreement,[4] the Department and the Board have agreed to advance money to the supplemental bond guaranty reserve account in accordance with section 339.135(6)(b), Florida Statutes (1993).
Pursuant to section 288.9608(2), FDFC was activated as a public instrumentality of local government by Resolution 94-M-21 of the Board of County Commissioners of Orange County, Florida, Official Records Book 4774, Page 977, and the "Joinder to Interlocal Agreement" approved by the Board of County Commissioners of Alachua County. In July 1994, FDFC adopted a bond resolution authorizing the issuance of up to $1,500,000 in revenue bonds for the purpose of making a loan to Maddox Foundry & Machine Works (Maddox). If the bond issue is approved, Maddox will use the loan proceeds to acquire new equipment and expand its Alachua County plant. The project is expected to increase the amount of business *17 Maddox conducts in Alachua County and the number of people it employs within that community.
The bond resolution provides that FDFC will lend Maddox the net proceeds of the bond issue and that the loan will be secured as required by section 288.9607(4). The bond resolution further states that except as provided in the bond guaranty, FDFC is not obligated to pay the bonds except from the proceeds derived from the repayment of the loan to Maddox, and the bonds shall not constitute indebtedness within the meaning of any constitutional or statutory debt limitation or restriction. Additionally, the bonds are not subject to the provisions of any other law or charter relating to the authorization, issuance, or sale of bonds. The bond resolution also expressly provides that neither the credit nor the taxing power of FDFC, the County, or the State or any political subdivision thereof shall be pledged to the payment of the principal of or the interest on the bonds.
As required by section 288.9606(5), FDFC filed a complaint for validation of the bonds in circuit court. The circuit court then immediately issued an order to show cause why the bonds should not be validated. The state attorneys for the Second, Eighth, and Ninth Judicial Circuits filed an answer on behalf of the State pleading that they did not believe FDFC's complaint was in any way defective, insufficient, or untrue. After a hearing, the court entered a final judgment validating the revenue bonds. The court recognized that the bonds performed essential public and governmental purposes, and the benefits to Maddox were merely incidental to those purposes. In addition, the court recognized that the use of the funding scheme set forth in the investment agreement did not create any debt, pledge, or other obligation in anticipation of new taxpayers' revenues. Specifically, the court stated:
8. That the transaction does not involve the creation of any debt, pledge, or other obligation in anticipation of new taxpayers' revenues. The funds for the amortization of the bonds will be initially from the project. Thereafter, if necessary, funds will be from a Debt Service Reserve Account consisting of proceeds of the bond issue and then from a Bond Guaranty Reserve Account to be provided by grants and no interest loans from the private sector. Based on the considered judgment of the State Board of Administration, the Department of Transportation, and the Plaintiff, as reflected in the investment agreement and bond resolution received in evidence, payments from those sources should be sufficient to amortize the bonds.
9. That as an additional source of security, as a last resort and for purposes of increasing the marketability of the bonds, the Legislature authorized the Department of Transportation to commit for a fee to invest earnings from the State Transportation Trust Fund in the Florida Development Finance Corporation. Thereby, the Department of Transportation can earn a fee by virtue of its agreement to make such investment, and, upon funding of the investment, earn interest on the investment, together with repayment of principal, as a matter of first priority, from recoveries by the corporation from any businesses that receive bond proceeds but do not repay as agreed.
10. That the earnings on investment of the Transportation Trust Fund are from already appropriated and already invested funds. A transfer of existing revenue, pursuant to Section 288.9608(3) and in conformity with the budget amendment process set forth in Chapter 216, is the means by which such additional monies would become available.
11. That the subject bond issue was structured to generate the proceeds needed to fund plant expansion and capital equipment acquisition in a way that it is fully permissible under the Constitution and laws of Florida. In particular, under the revenue bond issue, neither the state nor any county or agency thereof will lend or use its taxing power or credit in contravention of the provisions of Article VII, Section 10, Florida Constitution (1968). The transaction, as analyzed in its details, amounts to a permissible use of existing public funds in a way that does not create a debt, liability, or other obligation, legal *18 or moral, for the State of Florida or any political subdivision or agency thereof. The Bond resolution clearly and prominently proclaims that the Bonds "SHALL NOT CONSTITUTE A DEBT, LIABILITY OR OBLIGATION OF THE [FLORIDA DEVELOPMENT FINANCE] CORPORATION, ALACHUA COUNTY OR THE STATE OF FLORIDA OR ANY POLITICAL SUBDIVISION THEREOF."
On November 9, 1994 the State filed a notice of appeal in this Court as directed by section 288.9606(5). That section provides that:
The validation of at least the first bond issue of THE CORPORATION [fdfc] SHALL BE APPEALED TO THE Florida Supreme Court. The complaint in the validation proceeding shall specifically address the constitutionality of using the investment of the earnings accrued and collected upon the investment of the minimum balance funds required to be maintained in the State Transportation Fund to guarantee such bonds. If such proceeding results in an adverse ruling and such bonds and guaranty are found to be unconstitutional, invalid, or unenforceable, then the corporation shall no longer be authorized to use the investment earnings accrued and collected upon the investment of the minimum balance of the State Transportation Trust Fund to guarantee any bonds.
In seeking review of the constitutionality of the investment of transportation trust fund earnings, FDFC has only presented two issues for our consideration: (1) whether the proposed bonds violate article VII, section 10 of the Florida Constitution, which prohibits, with certain exceptions, the pledge of public credit to aid private enterprise; and (2) whether a legitimate public purpose would be served by the project financed by the bond proceeds.
With regard to the first issue, FDFC contends that the proposed bonds do not pledge the public credit or taxing power. We agree. Section 288.9607(7)(c), the bond resolution, and the guaranty agreement all put the bondholders on notice that FDFC's obligation is limited to several specifically defined revenue sources. The bondholders clearly cannot compel a levy of taxes to pay the bond obligations and are put on notice of that fact in the bond instrument.
Nor is the State capable of requiring FDFC to use public funds to repay any State investment of transportation trust fund earnings. According to the terms of the Act and the investment agreement, the State's investment will be reimbursed with interest from monies on deposit in the Maddox subaccount and otherwise available to FDFC. The source of the otherwise-available revenue is not limited to any specific governmental revenue. State v. Miami Beach Redevelopment Agency, 392 So.2d 875, 898 (Fla. 1980). Hence, the State would have no right to resort to designated public funds to satisfy FDFC's special obligation. Furthermore, because the minimum balance of funds will not be disturbed under the investment agreement, the State will not need to raise taxes or appropriate other revenue to replenish the transportation trust fund as a result of its commitments under the investment agreement. Thus, the State's power to raise revenue for the transportation fund is unimpaired by the investment agreement.
Most importantly, the State's undertaking is to invest rather than give away the transportation trust fund earnings. The State expects that any investment it makes in FDFC will be repaid, on a first-priority basis with interest. Additionally, in consideration for its qualified commitment to invest in FDFC, the State will be paid a market-based fee reflecting the risk undertaken by the State.[5]
Finally, because the State's obligation under the investment agreement is to invest public trust funds, its participation in these bonds falls within the scope of article VII, section 10(a). Article VII, section 10 provides that the prohibition on the pledge of public credit shall not apply to the investment *19 of public trust funds. Accordingly, we are not dealing with a constitutional prohibition in this case. See Northern Palm Beach County Water Control District v. State, 604 So.2d 440, 441 (Fla. 1992).
Because the bonds do not pledge the public credit, it does not matter that the primary beneficiary of the project is a private entity. State v. Housing Finance Authority of Polk County, 376 So.2d 1158 (Fla. 1979). FDFC must show only that some public interest is served. Here, the legislature has clearly delineated the public purpose served by the bonds. See § 288.9602, Fla. Stat. We presume such findings to be valid unless they are so clearly erroneous as to go beyond the power of the legislature. Northern Palm Beach County Water Control District, 604 So.2d at 442. That is not the case here.
Unlike the bond issue invalidated in State v. City of Orlando, 576 So.2d 1315 (Fla. 1991), the transaction in the instant case does not involve a municipality acting alone with the intention of making a profit. The bonds in City of Orlando were issued by the city, and the proceeds were used to buy debt instruments of or make loans to other governmental units. This Court determined that the primary purpose of the bonds was to borrow money to reinvest for a profit and that this was not a municipal purpose pursuant to article VIII, section 2(b). We stated, however, that:
We have not overlooked the fact that the city may derive an incidental benefit from the economies of large-scale financing by borrowing some of the money under a local agency agreement to use for legitimate municipal purposes. This was a primary motivation for enactment of section 163.01 et seq., Florida Statutes (1989), known as the Florida Interlocal Cooperation Act of 1969. The act is not applicable to this case because the City of Orlando has not entered into an interlocal agreement with another public agency for the issuance of these bonds. Here, the city, acting alone, proposes to issue bonds and lend the proceeds with the intention of making a profit.
City of Orlando, 576 So.2d at 1318. The Florida Interlocal Cooperation Act of 1969 is applicable in the instant case, and consequently, we are able to find that a legitimate public purpose is served.
Based on the reasoning set forth above, we find that the use of transportation fund earnings in the manner prescribed by the Act does not violate Florida's Constitution. Accordingly, we hold the proposed bond issue of FDFC to be valid, and we affirm the final judgment entered below.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] All future references to the Act are to the 1993 version. The Act was amended in 1994, but those amendments are not relevant to the issues we address here. See Ch. 94-136, §§ 11-14, at 778, 797, Laws of Fla.
[2] "Maximum debt service requirement" is defined in the Investment Agreement as follows:

"Maximum Debt Service Requirement" shall mean, for any period of six-months or one year, as the case may be, during the life of any Bonds for which such determination is being made, the maximum amount of the Debt Service which is due or will become due during such period of time on or with respect to such Bonds. For the purposes of calculating the amount of the Maximum Debt Service Requirement with respect to any Bonds which bear interest at a variable rate, the Corporation shall utilize a fixed rate which it in its reasonable discretion determines to be appropriate.
"Debt service" is also defined in the investment agreement to mean:
with respect to any Bonds, and for any period, the aggregate amount of all interest charges due or which shall become due on or with respect to such Bonds during the period for which such determination is being made, plus the aggregate amount of scheduled principal payments due or which shall become due on or with respect to such Bonds during the period for which such determination is being made.
[3] "Trust fund earnings" are defined by the investment agreement as "the earnings accrued and collected upon the investment of the minimum balance of funds required to be maintained in the State Transportation Fund."
[4] In addition to the conditions precedent set forth in both section 288.9606 and the investment agreement, the agreement between the Department and the Board to make investments of the trust fund earnings in the supplemental bond guaranty reserve account is subject to the following limitations:

(a) Not more than $4,000,000 of the trust fund earnings earned in any fiscal year may be at risk at any time on one or more bonds issued by FDFC.
(b) No trust fund earnings shall be used to guarantee any bonds issued after June 30, 1998, or for any bonds, without regard to the date of issuance thereof, having a maturity longer than fifteen years.
(c) Once the aggregate outstanding principal amount of FDFC bonds exceeds $2,000,000, strict limitations shall be imposed to preclude a disproportionate amount of such bonds to any one company or business.
(d) The agreement to invest trust fund earnings is conditioned upon the availability of such funds and is limited to the trust fund earnings accrued and collected for the fiscal year of the Department in which notice is first received by the Secretary of Transportation, pursuant to section 288.9608(3), and the fiscal years of the Department thereafter.
(e) Trust fund earnings shall not be used for any purpose other than to provide for deficiencies in amortization payments.
[5] The fee the State currently receives is .35 percent of the principal balance of the bonds issued, payable annually.