In re EVERGLADES MEMORIAL HOSPITAL, INC., Debtor.

Banc One Leasing Corporation, Plaintiff,

v.

Everglades Memorial Hospital, Inc., and Palm Beach County Health Care District, Defendant.

Bankruptcy No. 98–31823–BKC–SHF. Adversary No. 98–3185–BKC–SHF–A.

United States Bankruptcy Court, S.D. Florida.

April 26, 2006.

Kenneth S. Rappaport, Esq., Boca Raton, FL, for Debtor.

MEMORANDUM OPINION DETERMINING PALM BEACH COUNTY HEALTH CARE DISTRICT TO HAVE NO FURTHER LIABILITY TO BANC ONE LEASING CORPORATION PURSUANT TO TERMS OF LEASE AGREEMENT

STEVEN H. FRIEDMAN, District Judge.

THIS CAUSE came before the Court for a trial on August 22, 2005 on Plaintiff

Banc One Leasing Corporation's ("Banc One") Fourth Amended Complaint (C.P.95) against Defendant Palm Beach County Health Care District ("District"). On May 18, 2005 this Court entered an Order Setting Evidentiary Hearing on Fourth Amended Complaint (C.P.234). The threshold issue was identified as follows:

> [W]hether the Palm Beach County Health Care District had agreed to underwrite payments to Banc One under the subject lease beyond the five (5)-year guaranty provided in the Palm Beach County Health Care Act.

The Court, having carefully considered the evidence presented, together with argument thereon, and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law.

## JURISDICTION

This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This is an adversary proceeding as to which the Court is authorized to hear and determine all matters regarding this case in accordance with 28 U.S.C. § 157(b)(2)(A), and Bankruptcy Rule 7001 *et seq.*

## THE EVERGLADES BANKRUPTCY

Everglades Memorial Hospital, Inc. ("Everglades") commenced a Chapter 11 case by filing a voluntary petition for relief on April 7, 1998 (Bankruptcy Case No. 98–31823). From approximately October 1, 1986 through the filing of the petition for relief, Everglades exercised exclusive use, possession, and control of the hospital facilities known as Everglades Memorial Hospital ("EMH"), located in Pahokee, Florida, together with its ancillary buildings and lands. As of November 21, 1998, Everglades surrendered possession and control of the hospital to the Palm Beach County Health Care District (C.P.153). Donald Kaplan, the liquidating trustee under the debtor's chapter 11 plan confirmed on March 26, 1999 (Bankruptcy Case No. 98–31823–BKC–SHF—C. P. 328), as successor to Everglades, thereafter continued to exercise exclusive possession and control of various assets of Everglades, including cash, accounts receivable, inventory, equipment, additional personal property, and certain real properties. *See* Liquidating Trustee's Quarterly Reports (Bankruptcy Case No. 98–31823—C. P. 428, 524, 554, 571, 575). Ultimately a public sale of these assets was conducted, the net proceeds of which were used to pay administrative expenses of the bankruptcy estate, as well as certain creditors, including Banc One and the District pursuant to the Settlement Agreement approved by this Court by Order dated June 14, 2001 (Bankruptcy Case No. 98–31823—C.P. 601).

## HISTORICAL BACKGROUND

The Northwestern Palm Beach County Public Hospital Board ("NW Board") was created by a special act of the Florida Legislature, Chapter 26106, effective May 18, 1949. The purpose of the NW Board was to determine the need for public hospitals in Northwestern Palm Beach County and provide oversight of the operating hospital facilities in that area. The NW Board operated and managed Everglades Memorial Hospital ("EMH"), located in Pahokee, Florida. In 1985, the debtor, Everglades Memorial Hospital, Inc. ("Everglades"), was created. On October 1, 1986 the NW Board transferred EMH operations to Everglades pursuant to a restructuring agreement. In 1987, the NW Board approached Banc One to finance the construction of a physicians office building and renovation of the emergency room and intensive care unit at EMH.

## THE PALM BEACH COUNTY HEALTH CARE ACT

The Palm Beach County Health Care Act (the "Act") was approved by the electorate in 1988. The Act created the Palm Beach County Health Care District (the "District") and " ... vested [it] with the authority and responsibility to provide for comprehensive planning and delivery of adequate health care (including, but not limited to, hospitals) and services for the citizens of Palm Beach County, particularly medically needy citizens" (Banc One. Ex. 2—Section 3). The Act provided that the NW Board would be abolished and that " ... all of the functions, rights, responsibilities, obligations, assets, and liabilities of said hospital board shall be transferred to and become the property and responsibility of the Palm Beach County Health Care District; said repeal, abolition, and transfer to take place 1 year after the effective date of this act." (Banc One Ex. 2—Section 11(2)). Pursuant to the Act, the rights and powers of the District fully vested as of November 8, 1989.

## FIVE YEAR LEGISLATIVE GUARANTEE

Under Section 3(20) of the Act, the District was directed, for a period of five (5) years following its creation, to turn over to EMH tax revenues collected from property owners within the geographic boundaries previously governed by the NW Board, in an amount equal to the level of tax funding turned over by the NW Board to EMH during the fiscal year immediately prior to the abolition of the NW Board under the Act (commonly referred to as the "legislative guarantee") (Banc One Ex. 2). During this five-year transition period, the District was prohibited from exercising any budgetary discretion when dealing with EMH.

There is no dispute that the District fully satisfied this legislative guarantee by turning over allocated tax revenues through its fiscal year ending September 30, 1994. With regard to the District's fiscal year commencing October 1, 1994, and thereafter, however, the District asserts that it had a right and duty under the Act to exercise discretion when making budgetary decisions including its decision to withhold further contributions to EMH until Everglades, which still controlled the operations of EMH, agreed to certain administrative policies and procedures designed to grant to the District and the public more control over the operations and fiscal management of EMH. EMH and the NW Board initiated an action in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida to compel the District to continue to subsidize EMH, using the District's *ad valorem* tax capabilities notwithstanding the expiration of the legislative guarantee under the Health Care Act. As a result of that litigation, the District was *not* compelled to provide further subsidies to fund EMH following the expiration of the legislative guarantee. At trial before this Court, Banc One was afforded the opportunity to demonstrate that the District, notwithstanding the expiration of the five-year legislative guarantee under the Palm Beach County Health Care Act, had undertaken the obligation to repay any balance due to Banc One under the Lease Agreement after application of all surplus hospital revenues of EMH.

## THE BANC ONE LEASE/PURCHASE AGREEMENT

On October 26, 1989, the NW Board executed a lease/purchase agreement with Banc One ("Lease Agreement"). According to the Lease Agreement, Banc One agreed to provide financing to the NW Board in the amount of $2,745,000, to be

repaid over ten years in semi-annual payments (Banc One Ex. 1). The signatory to the Lease Agreement on behalf of the NW Board was Donald Anderson in his capacity as the Administrator of EMH. On June 18, 1991, Banc One provided an additional $185,899.40 in financing pursuant to an amendment to the Lease Agreement, which included a revised payment schedule. The aggregate loan amount funded by Banc One to the NW Board was $2,930,899.40.

## DISTRICT'S ARGUMENT

The District contends that the terms of the Lease Agreement make payments expressly and solely payable from a specific source of funds (the surplus gross revenues of EMH), rather than from funds generally available to the NW Board (tax revenues). The District contends that, prior to executing the Lease Agreement and subsequent amendment, the NW Board did not obtain the consent of the registered voters of Palm Beach County such that payments due under the Lease Agreement could be lawfully defrayed with general tax revenues. Neither the full faith and credit of the NW Board, nor its taxing powers, were committed as security for repayment of the Lease. (Banc One Ex. 1, Sections 6.3, 12.8). Therefore, according to the District, Banc One assumed the risk that revenues generated by EMH might not be sufficient to fund the payment obligation due under the Lease Agreement. The Lease Agreement contains several provisions which expressly limit the source of repayment to surplus gross revenues of EMH, and disclaim any right to compel the NW Board to levy taxes to pay any balance due to Banc One in the event EMH revenues proved insufficient to repay Banc One:

Section 6.3. *Source of Rental Payments*. The Rental Payments and other amounts due hereunder shall be payable from proceeds of this Lease deposited in the Property Acquisition Fund and the Surplus Gross Revenues; however such amounts shall not constitute a lien on the property comprising the Hospital. Lessee may, but shall not be required to, advance any money derived from any source other than such Surplus Gross Revenues and other sources specifically identified herein for the payment of the Rental Payments, but such other funds or property of Lessee shall not be liable for the payment of the Rental Payments. This Agreement shall not constitute a general obligation of Lessee or the State or any political subdivision thereof, and the full faith and credit and taxing powers of Lessee are not pledged for the payment of the Rental Payments, and no person shall ever have the right to compel the application of any Lessee funds (other than the Surplus Gross Revenues) or the levy of ad valorem taxes for the payment of Rental Payments.

Section 12.8. *Liability Limited to Surplus Gross Revenues*. Notwithstanding any provision of this Agreement, the Lessee's liability to pay the Rental Payments and other amounts hereunder shall be limited to the Surplus Gross Revenues as provided in Section 6.3. In the event that such Surplus Gross Revenues shall be insufficient at any time to pay the Rental Payments and other expenses payable by the Lessee hereunder in full, the Lessee shall not be liable to pay or prepay such Rental Payments and other expenses other than from Surplus Gross Revenues.

(Lease Agreement, Banc One Ex. 1 pp 6–1 to 6–2, 12–4).

To further support the position of the District, testimony was elicited at trial to the effect that on October 11, 1989, Glen Torcivia, Esq., then-general counsel to the District, had a telephone conversation with

Jim Zook of Banc One. Mr. Torcivia testified that he specifically warned Mr. Zook that the District had not authorized execution of the Lease Agreement by the NW Board and that the District disavowed any responsibility for repayment of the Lease Agreement. Mr. Torcivia clarified and confirmed with Mr. Zook that Banc One's dealings with the NW Board under the Lease Agreement were at Banc One's risk.

At the District's October 30, 1989 public meeting, Donald Anderson reiterated that the District assumed no liability or responsibility to make payments under the Lease Agreement which the NW Board had just executed with Banc One (Banc One Ex. 16). The District, at that public meeting, further disclaimed responsibility under the Lease Agreement and directed Mr. Torcivia to issue another letter to that effect to Banc One (Banc One Ex. 16). Mr. Torcivia did, in fact, issue such a letter the next day (District Ex. S).

### BANC ONE'S ARGUMENT

Banc One contends that, regardless of the correspondence between various persons affiliated with the NW Board, the District, and Banc One prior to the execution of the Lease Agreement, the District assumed all obligations and benefits of the Lease Agreement on November 8, 1989 pursuant to the Act. Additionally, Banc One asserts that the District is legally obligated to make all payments when due and provide sufficient funding to make payments for the Lease Agreement's full ten-year term. Banc One predicates this conclusion on the text of the Palm Beach County Health Care Act, Chapter 87–450, which states that effective November 8, 1989, the District assumes "... all of the ... responsibilities, obligations, assets and the liabilities of [the NW Board]." (Banc One Ex. 2—Section 11(2)).

On October 16, 1989, Joel T. Strawn, Esq., counsel for the NW Board, issued to Banc One an opinion letter stating that he had reviewed the proposed Lease with Banc One, and that:

... effective November 8, 1989, all of the functions, rights, responsibilities, obligations, assets and liabilities of (NW Board) including the obligation and liabilities established under the (Lease) and related documents, will be transferred to and become the property and responsibility of the Palm Beach County Health Care District as provided for by the Palm Beach County Health Care Act.

(Banc One Ex. 6, ¶ (i)).

Banc One further contends, in support of its position that the District remains obligated under the Lease Agreement, that such a finding is supported by the fact that Banc One did not fund the loan until after the District subsumed the NW Board on November 8, 1989, and also by the fact that the District made payments to Banc One pursuant to the Lease Agreement for six years. At trial, Banc One offered the financial reports of the District, ostensibly corroborating that the District had assumed the Banc One lease by virtue of the District's listing of the rental payments as a ten-year capital lease obligation. According to Banc One, the covenants in the Lease Agreement providing that the Rental Payments are "absolute and unconditional" further confirms that the District is obligated for the entire ten-year term of the Lease Agreement. Another covenant relied upon in Banc One's argument is that "best efforts" would be utilized to obtain appropriations for the entire ten-year term (Banc One Ex. 1—Section 6.5).

### LEGAL ANALYSIS

The Lease Agreement is a contract and, as such, its construction and

enforcement are governed by principles of Florida's general contract law. *Schwartz v. Florida Board of Regents*, 807 F.2d 901, 905 (11th Cir.1987). In order to establish the basis of a contract, there must be common intent, or a "meeting of the minds" as to the terms of the contract. *Kuharske v. Lake County Citrus Sales*, 44 So.2d 641 (Fla.1949). The express terms of the Lease Agreement, together with the testimony of Banc One's representative, Charles Litt, and its bond counsel, Leonard Rice, as well as the written legal opinion of the NW Board's counsel, Joel Strawn, consistently acknowledged that the Lease Agreement was not intended to be a general obligation of the NW Board, and accordingly, that an approval of the Lease Agreement by voter referendum was not constitutionally required. Although the District did subsume the Lease Agreement upon its succession to the NW Board, the record establishes that the District did not undertake to pay the installments due under the Lease Agreement as a general obligation, payable from its general revenues, but instead committed to pay Banc One solely from the surplus gross revenues of EMH as specified in the Lease Agreement.

This Court is guided by several decisions of the Florida Supreme Court which differentiate between the nature of obligations which do not constitutionally require voter approval (special obligations), and those which are void if not formally approved by voting taxpayers (general obligations). In *Northern Palm Beach County Water Control District v. State*, 604 So.2d 440 (Fla.1992), the Board of Supervisors of the Water Control District adopted a resolution authorizing the issuance of bonds, and further providing that the bonds were to be " ... payable solely from the drainage assessments to the landowners ... the bonds 'shall not constitute a lien upon any of the facilities or proper-

ties' of the District." *Id.* at 442. Accordingly, the Court found that " ... the bonds do not contemplate a pledge of the District's credit," and were payable solely from the revenue sources identified in the bonds. *Id. See also State v. Broward County*, 468 So.2d 965 (Fla.1985).

The Supreme Court of Florida was faced with a similar issue in *State v. Inland Protection Financing Corp.*, 699 So.2d 1352 (Fla.1997), wherein a public benefits corporation issued bonds for financing the rehabilitation of contaminated sites. The Court found that the proposed bonds did not pledge the public credit or taxing power since the authorizing statute, the bond resolution, and the guaranty agreement all put the bondholders on notice that the obligation was limited to several specifically-defined revenue sources. *Id.* at 1356 (*citing State v. Florida Development Finance Corp.*, 650 So.2d 14, 18 (Fla.1995)). The Court in *Inland Protection Financing Corp.* further affirmed that the bond instrument unambiguously placed potential bondholders on notice that the bonds did not constitute a debt or obligation of the State and therefore are not underwritten by a pledge of a tax revenue source. *Id.*

## CONCLUSION

Upon consideration of the clear language of the Lease Agreement concerning the limited source of repayment, the Court concludes that the Lease Agreement constitutes a revenue obligation of the NW Board. As a result, Banc One's repayment source was limited to surplus gross revenues generated by EMH operations, which ceased in early 1998, just prior to the filing of Everglades' chapter 11 petition. As contemplated expressly by Sections 6.3 and 12.8 of the Lease Agreement, Banc One was contractually restricted to obtain repayment from those EMH revenues. It is Banc One, and not the District, which

bore the risk that the terms of the Lease Agreement might not be satisfied in the event that surplus revenues were not generated through the operation of EMH. Based upon the foregoing findings of fact and conclusions of law, it is

**ORDERED:**

(1) Palm Beach County Health Care District has no further liability to Banc One Leasing Corporation under the terms of the October 26, 1989 lease/purchase agreement.

(2) A status conference shall be conducted in this adversary proceeding on _____ at _____ at the **Forum Building Complex, 1675 Palm Beach Lakes Blvd., 8th Floor, West Palm Beach, Florida,** to consider the status of the remaining issues, if any, to be adjudicated herein.