695 So.2d 672 (1997)
William F. POE, Sr., Appellant, Cross-Appellee,
v.
HILLSBOROUGH COUNTY, City of Tampa, Florida and Tampa Sports Authority, Appellees, Cross-Appellants.
No. 90223.
Supreme Court of Florida.
May 22, 1997.
Rehearing Denied June 18, 1997.
*673 Diane D. Tremor and Chris H. Bentley of Rose, Sundstrom & Bentley, Tallahassee; and Thomas K. Morrison of Morrison, Morrison & Mills, Tampa, for Appellant, Cross-Appellee.
Emeline C. Acton, County Attorney; Mary Helen Campbell and Christine Beck, Assistant County Attorneys, Hillsborough County, Tampa; James D. Palermo, City Attorney and Jerry M. Gewirtz, Assistant City Attorney, City of Tampa, Tampa; Donald A. Gifford and John Van Voris of Shackleford, Farrior, Stallings & Evans, Tampa; and Raymond Ehrlich, Steven L. Brannock, Henry M. Morgan, Jr. and Susan L. Turner of Holland & Knight L.L.P., Tampa, for Appellees, Cross-Appellants.
Benjamin H. Hill, III, Dennis P. Waggoner and Gregory P. Brown of Hill, Ward & Henderson, P.A., Tampa, for Buccaneers Limited Partnership, Amicus Curiae.
PER CURIAM.
We have on appeal a decision of the trial court declaring invalid a proposed bond issue for a new "Community Stadium" in Tampa, Florida. We have jurisdiction pursuant to article V, section 3(b)(2) of the Florida Constitution, and reverse the decision below.

FACTS
The Tampa Bay Buccaneers (the "Bucs") NFL football team has played its home games in Tampa since 1976 in a stadium owned and operated by the Tampa Sports Authority (the TSA). In 1995, the Bucs franchise was sold to a new owner for approximately $192 million. Prior to the sale, the new owner advised local public officials that the team required additional stadium-related revenue sources, such as luxury suites, club seats, etc., in order to remain financially competitive with other NFL teams, and the team would seek to relocate to another city unless the TSA constructed a new stadium in Tampa offering the necessary amenities. The new owner reiterated his intention to move the team after the sale, but at no time submitted a relocation application to the NFL, which requires approval by threefourths of the member teams for such a move. Negotiations between the City of Tampa, Hillsborough County, and the Tampa Sports Authority (the Issuers) and the new owner of the Bucs commenced in the fall of 1995 and continued until an agreement for *674 the construction of a new stadium was reached on August 28, 1996.
In the interim, the Hillsborough County Board of County Commissioners passed an ordinance on July 10, 1996, levying a one-half cent local government infrastructure surtax for a period of thirty years "to acquire infrastructure for general government purposes, public education, and public safety." As required by law for the passage of an infrastructure surtax,[1] the ordinance provided for a referendum. The purpose of the half-cent sales tax, as presented to the electorate, was
to finance infrastructure for jails, police and Sheriff's equipment, fire stations, emergency vehicles, school construction, a community stadium, transportation improvements, libraries, parks, trails, stormwater improvements and public facilities.
(Emphasis added). The referendum was approved on September 3, 1996, by fifty-three percent of the voters. Hillsborough County, the Cities of Tampa, Plant City, and Temple Terrace, and the Hillsborough County School Board subsequently entered into an interlocal agreement for the distribution of tax revenue which provided that the net proceeds from the local option infrastructure surtax during the thirty-year duration of the tax would be distributed as follows: the School Board would receive twenty-five percent of the net proceeds each year; $318 million of the proceeds would be disbursed for construction of a new Tampa stadium (with that amount subject to change should there be a significant change in the debt service costs for the new stadium) and any remaining proceeds would be distributed among the county and municipalities pursuant to the distribution formulae in section 218.62, Florida Statutes (1995).
Under the Stadium Agreement, Stadium Parcel Development Agreement and Practice Area Development and Lease Agreement entered into between the TSA and the Bucs, and with the approval of the County and the City, the TSA agreed to construct a new 65,000 seat community stadium with amenities at a cost of $168.5 million to serve as the Bucs' home field, as well as a $12 million training facility to be used by the Bucs. In general terms, the Stadium Agreement provides that the Bucs will utilize the stadium for thirty years and will pay the TSA a $3.5 million annual fee, with $2 million allocated to stadium rent, $1 million as practice facility rent and $500,000 as a fee for certain development rights granted to the Bucs with respect to the surrounding stadium property. The TSA will receive $1.93 million annually from a surcharge on tickets for Buc games and other stadium events, and will retain fifty percent of all revenues from non-Buc events beyond the first $2 million in proceeds from these events, which accrues to the Bucs.

PROCEEDINGS BELOW
The proceedings at issue here began on September 27, 1996, when Mr. William ("Bill") Poe, in his capacity as a Tampa area resident and taxpayer, filed a complaint seeking a declaration that the actions of the County, the City and the TSA with regard to incurring debts, using the taxing power and pledging public credit for the construction and operation of the proposed new Tampa stadium project violated article VII, section 10(c) of the Florida Constitution.[2] The complaint *675 further sought an order from the circuit court permanently enjoining and restraining the governmental agencies from unconstitutionally incurring debts, pledging tax monies and credit and expending public funds for the construction and operation of the new Tampa stadium project.
On December 26, 1996, the TSA, the County and the City filed a complaint seeking to validate a series of revenue bond issues for the construction and equipping of a new stadium, the acquisition and construction of a practice facility and the demolition of the existing stadium. The TSA proposes to issue up to $33 million in bonds supported by state sales tax monies,[3] 11.5 million in bonds supported by the local option four-cent tourist development tax, and $160 million in bonds supported by revenues to be realized from a county-wide local option half-cent sales tax.
Upon agreement of all parties, the two complaints were consolidated for a bench trial, which was held the first week of March 1997. Although the circuit court declined to validate the bonds sought to be issued by TSA, it found that the new stadium project would serve a paramount public purpose and the bonds would be valid but for one clause in the lease agreement which granted the Bucs the first $2 million in net revenues from non-Buccaneer events. In light of this clause, the court concluded that the stadium project served a predominantly private purpose. In its subsequent order denying rehearing, the trial court noted, however, that it would "validate the bonds if an agreement can be made between the Bucs, the City of Tampa, Hillsborough County and the Tampa Sports Authority to revise paragraph 10 of the Stadium Agreement to delete the clause that grants the right to the Bucs to receive the first $2 million per year from non-Bucs events." Both parties challenge the trial court's final order on appeal to this Court.

APPEAL
The scope of judicial inquiry in bond validation proceedings is limited to the following issues: (1) determining the public body has the authority to issue the bonds; (2) determining if the purpose of the obligation is legal; and (3) ensuring that the bond issuance complies with the requirements of law. Rowe v. St. Johns County, 668 So.2d 196 (Fla.1996); Taylor v. Lee County, 498 So.2d 424 (Fla.1986). In the instant case, only the second condition is at issue. We have held that a bond issue does not violate article VII, section 10 so long as the project serves a "paramount public purpose," and any benefits to private parties from the project are incidental. Northern Palm Beach County Water Control Dist. v. State, 604 So.2d 440, 441-42 (Fla.1992); Wald v. Sarasota County Health Facilities Auth., 360 So.2d 763 (Fla.1978); State v. Jacksonville Port Auth., 204 So.2d 881 (Fla.1967).
In determining whether the trial court erred in finding that the new community stadium in Tampa does not serve a paramount public purpose based solely on the clause in the lease granting the Bucs the first $2 million dollars in net revenues from non-Buc events net of direct costs, we find the cases validating the bonds for the construction and operation of the Daytona Beach Motor Speedway to be instructive.
In the case of State v. Daytona Beach Racing & Recreational Facilities District, 89 So.2d 34 (Fla.1956), the City of Daytona Beach, through a special district set up to construct and operate a racing and recreational facility in the area, entered into a lease agreement with the Daytona Beach Motor Speedway corporation whereby the corporation was given the right of possession of a facility to be constructed for racing purposes for at least six months of each year for a period of forty years in order to conduct motorized races and other motorized events. Id. at 35. The special district retained the right of possession of the facility for its own purposes for the remaining six months of the year, and at other times when the corporation did not have events scheduled at the facility. The commission governing the special district subsequently filed a petition to validate $2,900,000 in bonds to pay *676 for the cost of constructing, maintaining and operating the racing facility. The Circuit Court in Volusia County validated the bonds and the state appealed in part on grounds that issuance of the bonds would be improper because the racing facility did not serve a "proper public purpose."
We held that the issuance of the bonds was valid, and rejected the state's argument as follows:
It [the State] cited State v. Town of North Miami, Fla., 59 So.2d 779; Adams v. Housing Authority of City of Daytona Beach, Fla., 60 So.2d 663; and City of Clearwater v. Caldwell, Fla., 75 So.2d 765. Each of these cases involved attempts of the city to use public funds to develop property for private benefit and gain and in each case the Court ruled such not to be proper public use. In each of these cases the private purpose was predominant, not incidental to a public purpose. The first case involved the development of an area for industrial purposes; the second involved the acquisition of an area for leasing to private enterprises for industrial and commercial purposes; and the third was concerned with the city being involved in the construction for leasing of hotels or apartments for private enterprise.
In the instant case a private corporation would be in a position to utilize private gain from the facility, but only for a portion of the year. Under the agreement between the District and the corporation, the corporation is given the use of the facilities to be constructed for a period of not less than six months in each year for the conduct of a schedule of motorized racing activities and attractions. The Commission is to have the use of the facilities for its own programs for a period of not less than six months each year and at all other times when not scheduled for use by the Corporation. The corporation would conduct automobile racing events of international interest, as well as other attractions. Tourism, both as between the areas of our State and as between the States of this Nation, is a competitive business. The sand and the sun and the water are not sufficient to attract those seeking a vacation and recreation. Entertainment must be offered. Even ignoring its use by the District for periods aggregating onehalf the year, or more, for other recreational and educational purposes for the public, the facility in question, considering the uses to which it will be adopted and their expected effect on the public welfare, is infinitely more a valid public purpose than would any of the schemes contemplated in the three instances cited above. The public purpose here seems to be predominant and the private benefit and gain to be incidental.
....
In the instant case the purpose of the facility is both to increase trade by attracting tourists and to provide recreation for the citizens of the District. We have on numerous cases approved as a public purpose the development of recreational facilities. See State v. City of Daytona Beach, 160 Fla. 13, 33 So.2d 218; State v. City of Jacksonville, Fla., 53 So.2d 306; State v. City of Pensacola, Fla., 43 So.2d 340. Appellee's brief ably cites authorities in other jurisdiction which are in accord with the holdings of this Court on the matter. In State v. City of Miami, Fla., 41 So.2d 545, we upheld the selling of certificates to enlarge the Orange Bowl Stadium in Miami and appellant cites cases from several jurisdictions which also validated bonds for the construction of such recreational facilities. Therefore, it is our opinion that the development of the facility in question would serve a valid public purpose, and that the private benefit and gain would be incidental thereto.
Appellant's final argument is that to lease the facility for a part of each year to a private corporation constitutes a violation of Section 10 of Article IX of the Constitution of Florida, F.S.A., which prohibits the loaning of the District's credit to any corporation. It contends that the effect of the contemplated contract with the Corporation is to allow it to use the facility for part of each year for forty years with no capital investment and consequently the credit of the District is loaned to the Corporation. But we have heretofore held that if an undertaking is for public purposes, Article *677 IX, § 10 of the Constitution is not violated even though some private parties may be incidentally benefited. We said in State v. Inter-American Center Authority, Fla, 84 So.2d 9, 12, supra:
Since the erection of a Trade Center is designed to strengthen cultural relations among the countries of the Western Hemisphere, it can not be said that it amounts to a pledge or loan of the credit of the state to an individual, company, corporation or association in violation of Section 10, Article IX of the Constitution.
In State v. Board of Control, Fla, 66 So.2d 209, 210, we said
The mere fact that some one engaged in private business for private gain will be benefited by every public improvement undertaken by the government or a governmental agency, should not and does not deprive such improvement of its public character or detract from the fact that it primarily serves a public purpose. An incidental use or benefit which may be of some private benefit is not the proper test in determining whether or not the project is for a public purpose.
This Court has in numerous instances approved the imposition of taxes as being an aid to a public purpose. State v. Inter-American Center Authority, supra; State v. City of Miami, Fla, 76 So.2d 294, dealing with an international trade mart (owned, however, by the city); C.V. Floyd Fruit Co. v. Florida Citrus Commission, 128 Fla. 565, 175 So. 248, 112 A.L.R. 562, involving a tax on citrus fruit for advertising purposes; State v. City of Daytona Beach, 160 Fla. 13, 33 So.2d 218, supra, upholding a tax for construction of an auditorium, stadium, boat basin and recreational center; State v. Dade County, Fla., 62 So.2d 404, where a warehouse and overhaul shop were to be constructed and then leased to airlines corporations and the revenue certificates were to be paid from rentals from such corporations; State v. City of Tallahassee, 142 Fla. 476, 195 So. 402, where the construction of an office building by the City for rental purposes was upheld as a public purpose; State v. Escambia County, Fla., 52 So.2d 125, where revenue certificates were sold to construct recreational facilities which could be leased out to private enterprises. It can clearly be seen that in the above cases this Court did not hold the imposition of taxes or use of tax monies to be invalid because some private businesses profited thereby, rather this Court ruled that the tax was for valid purposes notwithstanding the incidental private gain for private businesses. In State v. Town of North Miami Fla, 59 So.2d 779, supra, involving an area for industrial purposes; in Adams v. Housing Authority of City of Daytona Beach, Fla, 60 So.2d 663, involving leasing of lands for private, commercial and business enterprises; and in City of Clearwater v. Caldwell, Fla, 75 So.2d 765, supra, involving the construction for leasing of hotels and apartments, we held that the constitutional provision against the lending of the credit of a city would be violated. In those cases the incidental public purpose accomplished was too inconsequential in comparison to the private gain. We do not feel that the case at bar has such shortcomings and we express our opinion to be, in conformance with our views in the numerous instances referred to earlier in this opinion, that the issuance of the $2,900,000 revenue bonds is in aid of a valid public purpose and does not violate Section 10 of Article IX [now Article VII] of our State Constitution.
89 So.2d at 36-38.
The validity of the bonds for the Daytona Beach Motor Speedway came before this Court again, after the facility was constructed and had been operating for several years, in the context of a suit by the county tax collector and others against the special district and the City of Daytona Beach for the collection of taxes on the property leased to the special district and then subleased to the corporation. Daytona Beach Racing & Recreational Facilities Dist. v. Paul, 179 So.2d 349 (Fla.1965). In this second case, we found that a change in the lease agreement favorable to the corporation, which in essence gave the corporation exclusive use of the raceway all year, did not detract from our previous finding that the bonds were for a *678 predominantly public purpose so as to cause a loss of the special district's tax exemption. We explained:
To recapitulate, the decision of the District Court of Appeal attempts to distinguish the facts of the instant case from those involved in the bond validation case in order to predicate its decision upon a non-conflicting, changed factual situation. It stresses the fact the validated bonds could not be sold and that private financing in lieu was arranged primarily by the District entering contracts and executing a lease agreement with the Speedway operating corporation. However, it was contemplated from the beginning the Speedway racing operation would be conducted by a private corporation irrespective of whether the Speedway facilities were constructed with public or private funds. The original lease with the Speedway Corporation which was considered in the bond validation case provided the Speedway Corporation would control and operate the facility for six months each year for speedway racing purposes while the District reserved the remaining six months to use the facility for District purposes, including community or other public uses. The new and existing lease reduced the District's rights to the facility to a three-month period each year, with further provision the Speedway corporation could, if it desired, pre-empt the three months for speedway racing purposes. But as we have seen, the revising of the lease did not detract from the predominantly public purpose of the facility, which was the successful operation of the Speedway itself, pure and simple, as a tourist and business attraction to the areaa unique facility in the state which harmonized with customs of the City of Daytona Beach where automobile racing was conducted along the beach of the Atlantic Ocean opposite the city for many years past. The decision of this Court in the validation case went straight to the substance of the Speedway venture and held the public purpose of the facility was founded primarily upon the existence and successful operation of the racing facility itself as a community asset and not upon the division of the time in the lease for the use of the facility as between the District and the Speedway Corporation.
Id. at 355 (emphasis supplied). Like the bonds in the Daytona Beach Racing and Recreational Facilities cases, the bonds at issue in this case are valid for similar reasons, and the trial court erred in ruling otherwise.
Here, the trial court credited the testimony of the local government's expert witness who testified that the Bucs would provide an annual economic benefit to the Tampa Bay economy ranging from a high of $183 million to a low of $83 million and the Super Bowl scheduled to be held in the new stadium in the year 2001 can be expected to yield an economic benefit in excess of $300 million. In light of these findings, the trial court concluded, "[a]lthough economic forecasting is obviously not a precise science, the Court is of the opinion that the local community will realize substantial economic benefits from the continued presence of the Buccaneers and from hosting the 2001 Super Bowl and that over time these benefits can be expected to far exceed the cost of the new stadium." The court went on to find that:
In addition to the quantifiable economic benefits ... the Court heard credible testimony from the Mayor of Tampa, the Hillsborough County Administrator, the President of the Greater Tampa Chamber of Commerce and others regarding the immeasurable economic benefits realized as a result of national media exposure in newspapers and from the televised Buccaneer games and Super Bowls, including the value of such exposure in helping attract tourists and new businesses to the Tampa Bay area. Several witnesses testified that without an NFL team the community would find it more difficult to compete with other cities for new business. The evidence also established that the new stadium will host more than 40 major events each year, including 10 Buccaneers games, Tampa Bay Mutiny professional soccer games, University of South Florida football games, high school football games, the annual Outback Bowl football game, equestrian events, tractor pulls, motor cross events and concerts. The Court finds that the Buccaneers instill civic pride and camaraderie *679 into the community and that Buccaneer games and other stadium events also serve a commendable public purpose by enhancing the community image on a nationwide basis and providing recreation, entertainment and cultural activities to its citizens.
In essence then, the trial court's refusal here to validate these bonds was not based on a finding that the new stadium project failed to serve a paramount public purpose, but was due only to the court's belief that the Bucs got "too sweet" a deal with the one clause in the lease agreement allowing the Bucs to receive the first $2 million in proceeds from non-Buc events.
On appeal to this Court, Poe contends that the trial court's concerns as to this one clause should be extended to the entire lease agreement. Poe's criticism's of the terms of the lease agreement, and the "$2 million in non-Buc revenue" clause in particular, may well be valid. However, once a trial court has found that a "paramount public purpose" exists, the court cannot micromanage the arms-length business negotiations of the parties by striking discrete portions of a complex arrangement which, as a whole, the court candidly finds to be substantially beneficial to the public. Because this is exactly what the trial court did in the instant case, we cannot affirm its ruling on appeal. In addition, we reject Poe's contention that even when a project serves a paramount public purpose that only bonds which are to be repaid from revenues derived from the project itself may be validated if a private entity also derives some benefit from the project. See State v. City of Miami, 379 So.2d 651 (Fla.1980); State v. Sunrise Lakes Phase II Special Recreation Dist., 383 So.2d 631 (Fla. 1980); Panama City v. State, 93 So.2d 608 (Fla.1957).
While hardly satisfying, citizens of the Tampa area who, like Poe, feel that their local public officials have not served them well in this endeavor still have a remedy of sorts at the ballot box. Indeed, as noted earlier, the majority of citizens voting on the bond issue, while apparently fully aware of the obvious benefits of the deal to the Bucs ownership, nevertheless voted to go forward. Only time will tell if the policy choices made here were wise ones.
Accordingly, we reverse the trial court's order below and remand with directions to enter a judgment validating the bonds proposed to be issued by the TSA for the new community stadium project in Tampa.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Section 212.055(2), Florida Statutes (Supp. 1996).
[2] That provision provides that:

Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person; but this shall not prohibit laws authorizing:
....
(c) the issuance and sale by any county, municipality, special district or other local governmental body of (1) revenue bonds to finance or refinance the cost of capital projects for airports or port facilities, or (2) revenue bonds to finance or refinance the cost of capital projects for industrial or manufacturing plants to the extent that the interest thereon is exempt from income taxes under the then existing laws of the United State, when, in either case, the revenue bonds are payable solely from revenue derived from the sale, operation or leasing of the projects. If any project so financed, or any part thereof, is occupied or operated by any private corporation, association, partnership or person pursuant to contract or lease with the issuing body, the property interest created by such contract or lease shall be subject to taxation to the same extent as other privately owned property.
[3] The State has approved an application for the allocation of $2 million annually from State sales tax collections to fund construction of the new stadium pursuant to section 288.1162, Fla.Stat. (Supp.1996).