752 So.2d 530 (1999)
STATE of Florida, Appellant,
v.
OSCEOLA COUNTY, Appellee.
No. 94,135.
Supreme Court of Florida.
May 27, 1999.
Rehearing Denied March 8, 2000.
*531 Lawson L. Lamar, State Attorney, and Cloyce L. Mangas, Jr., Assistant State Attorney, Ninth Judicial Circuit, Orlando, Florida, for Appellant.
Gregory T. Stewart and Virginia Saunders Delegal, Tallahassee, Florida, and John R. Stokes, Tampa, Florida, of Nabors, Giblin & Nickerson, P.A., and Jo O. Thacker, Osceola County Attorney, Kissimmee, Florida, for Appellee.
PER CURIAM.
We have on appeal a decision of the trial court declaring that a proposed bond issue is valid. We have jurisdiction. Art. V, § 3(b)(2), Fla. Const. We affirm the bond validation judgment.

MATERIAL FACTS
In 1997, Osceola County by ordinance declared the levy of a one percent tax pursuant to the Local Option Tourist Development Act, section 125.0104, Florida Statutes (1997).[1] The County intended to use this tourist tax to pay the debt service on bonds issued to finance the renovation of an existing stadium and the construction and acquisition of a convention center. According to the ordinance, all monies generated by the tourist tax had to be applied first to the renovation of the stadium, then to the construction of the convention center. In July 1998, the County adopted a resolution, entitled "Tourist Development Tax Revenue Bond Resolution," for the issuance of Series 1998 Bonds not exceeding $35,000,000 for the purpose of acquiring, constructing, and equipping a county-owned convention center.[2] The Resolution was adopted pursuant to the ordinance and section 125.0104(3)(l). According to the Resolution, the convention center would be constructed in accordance with design specifications contained in a Purchase and Sale Agreement ("Development Agreement") between the County and Osceola Development Project, L.P. ("ODP"), a private entity. Uncontroverted evidence admitted at the validation proceeding established that ODP, rather than *532 the County, would construct the convention center. The County would then purchase the convention center upon completion if all of the contract conditions have been met.[3] Although the County will own the facility, the Resolution provided that ODP will operate the convention center in accordance with the provisions of the Convention Center Operating Agreement ("Operating Agreement"), a separate contract between the County and ODP.[4] Under the terms of the Operating Agreement, ODP, as operator of the convention center, will retain all revenue generated by the operation of the convention center throughout the period of the Agreement (i.e., twenty years).
In August of 1998, pursuant to chapter 75, Florida Statutes (1997), the County filed a complaint in circuit court to validate the bonds. The complaint alleged the County was authorized by section 125.0104 of the Florida Statutes to issue revenue bonds to (a) pay for the cost of acquiring and constructing a publicly owned convention center; (b) establish a debt service reserve account, if necessary; and (c) pay costs associated with the issuance of the bonds. The complaint further alleged that the bonds will not constitute a general indebtedness of the County or a pledge of its full faith and credit and taxing power within the meaning of any constitutional or statutory provision or limitation. The State answered the complaint, denying that all requirements of law had been satisfied.[5]
The Circuit Court of the Ninth Judicial Circuit, after hearing testimony[6] and arguments by counsel, issued a Final Judgment validating the bonds. The court found that the County fully complied with all of the requirements of chapter 75, Florida Statutes (1997); that proper notice of the validation proceeding was given as required by law; that the County is authorized under section 125.0104 to issue the bonds for the purposes of financing the acquisition and construction of the convention center, establishing a debt service reserve account, and paying the costs associated with the issuance of the bonds. In addition, the court approved the levy of the one percent tourist tax for repayment of the bonds and approved both the Development Agreement and the Operating Agreement between the County and ODP. Finally, the court found that the construction *533 and operation of the convention center serves a valid and paramount public purpose in that it will directly promote the economy of the County and the State; it will further the development of tourism-related business activity, thereby providing a more stable economy and an increase in employment; it will provide a forum for educational, recreational and entertainment activities for the citizens of the County and State; and it will satisfy an existing need for such facility in Osceola County, thereby promoting the attractiveness of the County and the State to outside business interests and visitors.
The State filed its notice of appeal on October 12, 1998. This appeal follows.

APPEAL
This Court's scope of review in bond validation cases is limited to the following issues: (1) whether the public body has the authority to issue bonds; (2) whether the purpose of the obligation is legal; and (3) whether the bond issuance complies with the requirements of the law. See State v. Inland Protection Fin. Corp., 699 So.2d 1352 (Fla.1997); Poe v. Hillsborough County, 695 So.2d 672 (Fla.1997); Northern Palm Beach County Water Control Dist. v. State, 604 So.2d 440 (Fla. 1992); Taylor v. Lee County, 498 So.2d 424 (Fla.1986). A final judgment validating bonds comes to this Court with a presumption of correctness.[7]See Wohl v. State, 480 So.2d 639, 641 (Fla.1985). The appellant has the burden of demonstrating that the record and evidence fails to support the County and the trial court's conclusions. See id. In the case sub judice, the State argues that none of the three prongs have been satisfied. We disagree.

Authority to Issue Bonds
Clearly, the County has the authority to issue bonds. See § 125.01(1)(r), Fla. Stat. (1997) ("The legislative and governing body of a county shall have the power to ... [l]evy and collect taxes, ... borrow and expend money[,] and issue bonds[.]"); see also Rowe v. St. Johns County, 668 So.2d 196 (Fla.1996) (holding that noncharter county has authority under section 125.01 to issue revenue bonds for purpose of acquiring convention facility); Taylor, 498 So.2d at 426. At issue in this case, however, is the County's authority under section 125.0104 to issue bonds for the purpose of acquiring the convention center. The State contests the County's authority under section 125.0104(3)(l) to levy the additional one percent tax for the purpose of acquiring the convention center. In other words, because the County is not constructing the convention center, but rather, is acquiring it from a private entity to be operated by a private entity, the State argues the County is without statutory authority to levy the additional one percent tax for purposes of repaying the bonds.
To best understand the provisions contained within section 125.0104, we begin our analysis with a brief overview of the taxing purposes permitted by the statute. Under subsection 125.0104(3)(c), the County may impose a one or two percent tax on every dollar of the total consideration received from leases or rentals in any hotel, motel, condominium, and other living quarters or accommodations, for a period of six months or less. In addition to this "base" tax, the statute permits the levy of additional one percent taxes for certain specified uses.[8] For example, subsection *534 125.0104(3)(d) permits the County to impose an additional one percent tax for the purposes set forth in subsection (5). Under that subsection, the County may levy taxes for a number of permitted uses:
(a) All tax revenues received pursuant to this section by a county imposing the tourist development tax shall be used by that county for the following purposes only:
1. To acquire, construct, extend, enlarge, remodel, repair, improve, maintain, operate, or promote one or more publicly owned and operated convention centers, sports stadiums, sports arenas, coliseums, or auditoriums, or museums that are publicly owned and operated or owned and operated by not-for-profit organizations and open to the public, within the boundaries of the county or subcounty special taxing district in which the tax is levied.
§ 125.0104(5)(a)1, Fla. Stat. (1997).
At issue in this case is section 125.0104(3)(l), which permits an additional one percent tax for the specific purpose of paying the debt service on bonds issued to finance the construction of sports facilities or convention centers:
(l) In addition to any other tax which is imposed pursuant to this section, a county may impose up to an additional 1-percent tax on the exercise of the privilege described in paragraph (a) by majority vote of the governing board of the county in order to:
1. Pay the debt service on bonds issued to finance the construction, reconstruction, or renovation of a professional sports franchise facility, either publicly owned and operated, or publicly owned and operated by the owner of a professional sports franchise or other lessee with sufficient expertise or financial capability to operate such facility, and to pay the planning and design costs incurred prior to the issuance of such bonds.
2. Pay the debt service on bonds issued to finance the construction, reconstruction, or renovation of a convention center, and to pay the planning and design costs incurred prior to the issuance of such bonds.
3. Only counties that have elected to levy the tax initially for the purposes authorized in subparagraph 1. may use the tax for the purposes enumerated in subparagraph 2.
§ 125.0104(3)(l)1.-3., Fla. Stat. (1997)[9] (emphasis added).
Notwithstanding the above, subsection 125.0104(5) specifically limits the uses for which each tax may be imposed to those purposes expressly authorized: "Any use of the local option tourist development tax revenues collected pursuant to this section for a purpose not expressly authorized by paragraph (3)(l) or paragraph [(3)(n)] or *535 paragraph (a), paragraph (b), or paragraph (c) of this subsection is expressly prohibited." § 125.0104(5)(d). Thus, the legislature has provided that the taxes permitted under this section may only be levied for the particular use authorized. Based on this language, the State contends that subsection 125.0104(3)(l), which limits the tourist tax to the payment of debt service for the purpose of financing the construction of a convention center, does not include the acquisition of a convention center. They support this argument by pointing to the preceding subsection, 125.0104(3)(d), which permits tax dollars to be used for the purpose of acquiring a convention center. In other words, the State argues had the legislature intended to grant counties the authority to levy taxes for the purpose of paying the debt service of bonds issued to finance the acquisition of a convention center, it certainly could have done so by including the word "acquisition" in subsection 125.0104(3)(l).
Contrary to the State's posture, we do not read the language in section 125.0104(3)(l) so narrowly. The section refers to the financing of the construction, reconstruction, or renovation of a professional sports facility or a convention center. There is nothing within the confines of this provision which indicates an intent to limit the use of bonds to the construction, reconstruction, or renovation of a convention center to the exclusion of all other acts permitted by the statute.[10]See § 125.0104(5)(a)1. Further, even if such a narrow construction was intended, we find the County's intended act of acquiring the completed convention center to fall within the meaning of the phrase "finance the construction" of the convention center. According to the facts in this case, the convention center is being built according to the County's design specifications and the Development Agreement states that the County is not obligated to purchase the convention center unless all conditions have been satisfied. Thus, we find the County plays an active role in the construction of the convention center even if it is not responsible for the actual physical construction of the facility.

Legal Purpose
This Court must next determine whether the purpose for which the County intends to expend public funds is legal. Article VII, section 10 of the Florida Constitution prohibits counties from using their taxing power or pledging public funds to aid a private entity unless the project falls within one of the four subsections. See Art. VII, § 10, Fla. Const.; see also Northern Palm Beach County Water Control Dist., 604 So.2d at 441. Because none of the exceptions listed in the constitution apply in this case, this Court must determine whether the County has exercised its taxing power or pledged its credit. See Northern Palm Beach County Water *536 Control Dist., 604 So.2d at 442. If the County has not exercised its taxing power or pledged its credit, the obligation must merely serve a public purpose. See id; Linscott v. Orange County Indus. Dev. Auth., 443 So.2d 97, 101 (Fla.1983) (involving revenue bonds supported solely by revenues from project).[11] On the other hand, if the County has used either its taxing power or pledge of credit to support the issuance of the bonds, the purpose of the obligation must serve a paramount public purpose and any benefits to a private party must be incidental. See Poe, 695 So.2d at 675; Northern Palm Beach County Water Control Dist., 604 So.2d at 441-42; but see State v. Osceola County Indus. Dev. Auth., 424 So.2d 739 (Fla.1982) (no pledge of credit involved but Court determined whether obligation served paramount public purpose). In this case, the County levied taxes under section 125.0104, and therefore this Court must determine whether the convention center serves a paramount public purpose. We find that it does.
In Poe v. Hillsborough County, the City of Tampa, Hillsborough County and the Tampa Sports Authority (TSA) contracted with the owner of the Tampa Bay Buccaneers for the construction of a new sports stadium, the acquisition and construction of a practice facility, and the demolition of the old sports stadium. Under the terms of the agreement, the Buccaneers were to use the stadium for thirty years and pay the TSA a $3.5 million annual fee for various uses. The TSA was also to receive $1.93 million annually from a surcharge on tickets to stadium events, including Buccaneers games, and retain fifty percent of all proceeds from non-Buccaneers events beyond the first $2 million in proceeds from such events, which was to accrue to the Buccaneers. See 695 So.2d at 674. The County, City and the TSA then filed a complaint seeking to validate several revenue bond issues for the purpose of covering the costs of the above projects. The TSA proposed to issue $33 million in bonds supported by state sales tax monies, $11.5 million in bonds supported by the local option four-cent tourist development tax, and $160 million in bonds supported by revenues from a county-wide local option half-cent sales tax. See id. at 675. The trial court found that the construction of the sports stadium would serve a valid public purpose but for the clause in the agreement granting the Buccaneers the first $2 million in proceeds from non-Buccaneer events. See id. Accordingly, the trial court declined to validate the bonds.
On appeal, this Court reversed, holding, in part, that the sports stadium project served a valid public purpose, notwithstanding the fact the first $2 million in proceeds for non-Buccaneer events accrued to a private entity. See id. at 677.[12] In so holding, we quoted extensively from our prior decision in State v. Daytona Beach Racing & Recreational Facilities District, 89 So.2d 34 (Fla.1956), which rejected the State's argument that constructing, maintaining and operating a racing *537 facility did not serve a "proper public purpose":
In determining whether the trial court erred in finding that the new community stadium in Tampa does not serve a paramount public purpose based solely on the clause in the lease granting the Bucs the first $2 million dollars in net revenues from non-Buc events net of direct costs, we find the cases validating the bonds for the construction and operation of the Daytona Beach Motor Speedway to be instructive.
In the case of State v. Daytona Beach Racing & Recreational Facilities District, 89 So.2d 34 (Fla.1956), the City of Daytona Beach, through a special district set up to construct and operate a racing and recreational facility in the area, entered into a lease agreement with the Daytona Beach Motor Speedway corporation whereby the corporation was given the right of possession of a facility to be constructed for racing purposes for at least six months of each year for a period of forty years in order to conduct motorized races and other motorized events. Id. at 35. The special district retained the right of possession of the facility for its own purposes for the remaining six months of the year, and at other times when the corporation did not have events scheduled at the facility. The commission governing the special district subsequently filed a petition to validate $2,900,000 in bonds to pay for the cost of constructing, maintaining and operating the racing facility. The Circuit Court in Volusia County validated the bonds and the state appealed in part on grounds that issuance of the bonds would be improper because the racing facility did not serve a "proper public purpose."
We held that the issuance of the bonds was valid, and rejected the state's argument as follows:
It [the State] cited State v. Town of North Miami, Fla., 59 So.2d 779; Adams v. Housing Authority of City of Daytona Beach, Fla., 60 So.2d 663; and City of Clearwater v. Caldwell, Fla., 75 So.2d 765. Each of these cases involved attempts of the city to use public funds to develop property for private benefit and gain and in each case the Court ruled such not to be proper public use. In each of these cases the private purpose was predominant, not incidental to a public purpose. The first case involved the development of an area for industrial purposes; the second involved the acquisition of an area for leasing to private enterprises for industrial and commercial purposes; and the third was concerned with the city being involved in the construction for leasing of hotels or apartments for private enterprise.
In the instant case a private corporation would be in a position to utilize private gain from the facility, but only for a portion of the year. Under the agreement between the District and the corporation, the corporation is given the use of the facilities to be constructed for a period of not less than six months in each year for the conduct of a schedule of motorized racing activities and attractions. The Commission is to have the use of the facilities for its own programs for a period of not less than six months each year and at all other times when not scheduled for use by the Corporation. The corporation would conduct automobile racing events of international interest, as well as other attractions. Tourism, both as between the areas of our State and as between the States of this Nation, is a competitive business. The sand and the sun and the water are not sufficient to attract those seeking a vacation and recreation. Entertainment must be offered. Even ignoring its use by the District for periods aggregating one-half the year, or more, for other recreational and educational purposes for the public, the facility in question, considering the *538 uses to which it will be adopted and their expected effect on the public welfare, is infinitely more a valid public purpose than would any of the schemes contemplated in the three instances cited above. The public purpose here seems to be predominant and the private benefit and gain to be incidental.

. . . .
In the instant case the purpose of the facility is both to increase trade by attracting tourists and to provide recreation for the citizens of the District. We have on numerous cases approved as a public purpose the development of recreational facilities. See State v. City of Daytona Beach, 160 Fla. 13, 33 So.2d 218; State v. City of Jacksonville, Fla., 53 So.2d 306; State v. City of Pensacola, Fla., 43 So.2d 340. Appellee's brief ably cites authorities in other jurisdiction which are in accord with the holdings of this Court on the matter. In State v. City of Miami, Fla., 41 So.2d 545, we upheld the selling of certificates to enlarge the Orange Bowl Stadium in Miami and appellant cites cases from several jurisdictions which also validated bonds for the construction of such recreational facilities. Therefore, it is our opinion that the development of the facility in question would serve a valid public purpose, and that the private benefit and gain would be incidental thereto.
Appellant's final argument is that to lease the facility for a part of each year to a private corporation constitutes a violation of Section 10 of Article IX of the Constitution of Florida, F.S.A., which prohibits the loaning of the District's credit to any corporation. It contends that the effect of the contemplated contract with the Corporation is to allow it to use the facility for part of each year for forty years with no capital investment and consequently the credit of the District is loaned to the Corporation. But we have heretofore held that if an undertaking is for public purposes, Article IX, § 10 of the Constitution is not violated even though some private parties may be incidentally benefitted. We said in State v. Inter-American Center Authority, Fla., 84 So.2d 9, 12, supra:
Since the erection of a Trade Center is designed to strengthen cultural relations among the countries of the Western Hemisphere, it can not be said that it amounts to a pledge or loan of the credit of the state to an individual, company, corporation or association in violation of Section 10, Article IX of the Constitution. In State v. Board of Control, Fla.,
66 So.2d 209, 210, we said
The mere fact that some one engaged in private business for private gain will be benefitted by every public improvement undertaken by the government or a governmental agency, should not and does not deprive such improvement of its public character or detract from the fact that it primarily serves a public purpose. An incidental use or benefit which may be of some private benefit is not the proper test in determining whether or not the project is for a public purpose.

This Court has in numerous instances approved the imposition of taxes as being an aid to a public purpose. State v. Inter-American Center Authority, supra; State v. City of Miami, Fla., 76 So.2d 294, dealing with an international trade mart (owned, however, by the city); C.V. Floyd Fruit Co. v. Florida Citrus Commission, 128 Fla. 565, 175 So. 248, 112 A.L.R. 562, involving a tax on citrus fruit for advertising purposes; State v. City of Daytona Beach, 160 Fla. 13, 33 So.2d 218, supra, upholding a tax for construction of an auditorium, stadium, boat basin and recreational center; *539 State v. Dade County, Fla., 62 So.2d 404, where a warehouse and overhaul shop were to be constructed and then leased to airlines corporations and the revenue certificates were to be paid from rentals from such corporations; State v. City of Tallahassee, 142 Fla. 476, 195 So. 402, where the construction of an office building by the City for rental purposes was upheld as a public purpose; State v. Escambia County, Fla., 52 So.2d 125, where revenue certificates were sold to construct recreational facilities which could be leased out to private enterprises. It can clearly be seen that in the above cases this Court did not hold the imposition of taxes or use of tax monies to be invalid because some private businesses profited thereby, rather this Court ruled that the tax was for valid purposes notwithstanding the incidental private gain for private businesses. In State v. Town of North Miami, Fla., 59 So.2d 779, supra, involving an area for industrial purposes; in Adams v. Housing Authority of City of Daytona Beach, Fla., 60 So.2d 663, involving leasing of lands for private, commercial and business enterprises; and in City of Clearwater v. Caldwell, Fla., 75 So.2d 765, supra, involving the construction for leasing of hotels and apartments, we held that the constitutional provision against the lending of the credit of a city would be violated. In those cases the incidental public purpose accomplished was too inconsequential in comparison to the private gain. We do not feel that the case at bar has such shortcomings and we express our opinion to be, in conformance with our views in the numerous instances referred to earlier in this opinion, that the issuance of the $2,900,000 revenue bonds is in aid of a valid public purpose and does not violate Section 10 of Article IX [now Article VII] of our State Constitution.
Poe, 695 So.2d at 675-77 (quoting Daytona Beach Racing & Recreational Facilities Dist., 89 So.2d at 36-38) (emphasis added).
As we did in Poe and Daytona Beach Racing & Recreational Facilities Dist., we find the convention center in this case serves a paramount public purpose. As the trial court found, the convention center would, among other things, promote gainful employment, promote outside business interests and tourism, and provide a forum for educational, recreational and entertainment activities. Such interests have been found to serve a public purpose. See City of Miami, 379 So.2d at 653 (recognizing that interests such as providing forum for educational, civic, and community activities and increasing tourism and international trade serve public purpose). The fact that the proposed project will be operated by a private entity does not negate the public character of the project. See Osceola County Indus. Dev. Auth., 424 So.2d at 742; Daytona Beach Racing & Recreational Facilities Dist. v. Paul, 179 So.2d 349, 354 (Fla.1965); see generally State v. Orange County Indus. Dev. Auth., 417 So.2d 959, 962-63 (Fla.1982) (holding that revenue bonds issued for construction and operation of hotel by private corporation constituted paramount public purpose where hotel was integral part of convention center). Accordingly, we find the State has not met its burden by showing that the convention center fails to serve a paramount public purpose.

Compliance with Requirements of Law
Finally, this Court must determine whether the issuance of the bonds comports with the requirements of the law. Chapter 75 of the Florida Statutes sets forth the procedure counties must follow in issuing and validating bonds and it does not appear from the record in this case that the County deviated from these requirements. The County approved by Ordinance the assessment of a one percent tourist tax for the purpose of paying the debt service on bonds issued to finance the construction and acquisition of a convention *540 center. The County then determined by resolution to issue revenue bonds for the purpose of financing the construction and acquisition of the convention center. Following the adoption of the resolution, the County filed a complaint for validation in circuit court. In compliance with section 75.04, the complaint alleged the County's authority to issue the bonds, the ordinance and resolution authorizing the issuance of bonds, the amount of the bonds (i.e., not exceeding $35,000,000), and the interest the bonds will bear (i.e., an amount not to exceed the maximum permitted by law). See Dorman v. Highlands County Hosp. Dist., 417 So.2d 253 (Fla.1982) (holding that allegation in complaint that bonds will bear "interest at rates not to exceed the maximum rate permitted by law at time of issuance" complied with section 75.04's requirement concerning rate of interest). The complaint was filed against the State and the taxpayers, property owners, and citizens of Osceola County. Nothing more was required from the County.
Contrary to the State's assertion, the plain language of chapter 75 does not require the County to allege the cost of the project or to include the Osceola Trace Community Development District as an indispensable party to this action. As for the former, the statute only requires the County to identify the amount of the bonds to be issued, which it did in this case by alleging that the bonds would not exceed $35,000,000. As for the latter, the only necessary parties under chapter 75 are the bond-issuing entity and the State. See §§ 75.04, .05; Broward County v. State, 515 So.2d 1273 (Fla.1987) (holding bondholders are not indispensable parties to bond validation proceeding). Accordingly, the County was not required to include the District as a party to this cause. Based on the foregoing, it appears the County has complied with the requirements of the law in authorizing the issuance of the bonds in this case.[13] Accordingly, we affirm the trial court's order validating the issuance of bonds in this case.
It is so ordered.
HARDING, C.J., and SHAW, WELLS, ANSTEAD, PARIENTE and LEWIS, JJ., concur.
QUINCE, J., concurs in result only.
NOTES
[1] A referendum was not required to pass the ordinance. See § 125.0104(3)(l).
[2] According to the County's complaint, the convention center will be a component of a larger, multi-phase complex which will include a World Expo Center, a Hyatt Hotel, an entertainment/retail commercial venue, parking facilities, and a public safety facility. As a separate transaction, the County created the Osceola Trace Community Development District ("District") for the purpose of funding the roadway and drainage facilities within the entire project. However, none of the funds from the subject bonds will be applied to the cost of constructing the roadway or drainage facilities.
[3] A draft form of the Development Agreement was attached to the resolution as an appendix.
[4] The Operating Agreement was included as an exhibit to the resolution.
[5] Specifically, the State listed several defects in the complaint, including: (1) the complaint fails to allege the amount of the bonds to be issued and the interest they are to bear; (2) the complaint does not contain an indenture, the resolution attached to the complaint omits material information, and the complaint's allegation that it will comply with rule 15c12-12 of the Securities Exchange Commission in the future is insufficient; (3) the County lacks authority under section 125.0104(3)(l)2. because the statute does not authorize the County to purchase a convention center from a third party; (4) the County lacks authority under chapter 75 to issue the bonds; (5) the County's public purpose for issuing the bonds is doubtful; (6) the County failed to join the Osceola Trace Community Development District as an indispensable party; and (7) the complaint is not ripe for consideration by the circuit court because the County does not yet know the design or cost of the convention center nor the regional impact this project will have.
[6] The County's expert economist, Dr. Hank Fishkind, testified during the validation proceedings that the convention center would pay for itself through the revenues collected from the local option tourist development tax and from proceeds from hotel and motel accommodations in Osceola County by persons who will participate in meetings at the convention center. Dr. Fishkind also opined the convention center will create approximately 300 jobs, stimulate businesses providing services to the convention center, stimulate hotel business in the County because of an increase in overnight quests, and promote Osceola county as a "player in the context of business meetings." Finally, Dr. Fishkind testified that the convention center is the lynch pin for a much larger project, the Osceola Trace Project.
[7] We note at the outset that none of the issues raised by the state during the bond validation proceedings below were addressed in the Final Judgment. We also note that the Final Judgment was prepared in advance by the County and submitted to the trial court at the end of the validation hearing and signed by the trial judge that same day. Although we affirm the trial court's order in this case, we urge trial courts to treat the material issues raised by the State Attorney in such cases.
[8] In addition to the one percent taxes specified in the body of this opinion, section 125.0104(3)(n) also authorizes an additional one percent tax for the purpose of paying the debt service on bonds issued for the purpose of financing the construction of a facility where the county has imposed a tax as specified in subsection (3)(l). However, subsection (n) imposes an additional limitation: namely, if the county imposes the tax authorized in this subsection, it "may not expend any ad valorem tax revenues for the construction, reconstruction or renovation of that facility." See § 125.0104(3)(n).
[9] The wording in paragraph 3. apparently guided the County in its adoption of the Ordinance because it explains why the County designated the use of tax revenues to the renovation of the stadium first and to the construction of the convention center second. Subparagraph 3 of this section was amended in 1998 and now reads:

3. Pay the operation and maintenance costs of a convention center for a period of up to 10 years. Only counties that have elected to levy the tax for the purposes authorized in subparagraph 2. may use the tax for the purposes enumerated in this subparagraph.
§ 125.0104(3)(l)3., Fla. Stat. (Supp.1998); see also Ch. 98-106, Laws of Fla. (1998) (effective May 22, 1998). Thus, it is no longer necessary for the County to designate tax dollars to stadium renovations before applying such monies to the construction of the convention center. Contrary to the State's assertion, we do not find the changes to subparagraph 3. to be of particular relevance in resolving the issues in this case.
[10] To the contrary, the legislative history to the enactment of subsection 125.0104(3)(l) indicates the legislature's fervid interest in attracting professional sports franchises for the purpose of inducing non-polluting economic development, promoting tourism and recreation, and improving the prosperity and welfare of the state and its citizens. See Ch. 88-226, Laws of Fla. (1988). Further, through the enacting law, the legislature recognized that constructing sports facilities, as a means for attracting and keeping such franchises, will provide immediate benefits to the state and local areas. See id. Apparently, in keeping with the overall public purposes served by attracting professional sports franchises, the legislature amended the section in 1995 by adding convention centers to the list of permitted uses under subsection 125.0104(3)(l). See Ch. 95-304, § 3, Laws of Fla. (1995). Based upon our review of these laws, we find that the legislature was more concerned with the means of attracting and retaining outside sports franchises, i.e., by permitting state and local government to levy taxes for the purposes of financing necessary capital projects, than with drawing distinctions between the meaning of the word "construction" on the one hand and the meaning of the word "acquisition" on the other. Stated otherwise, the focus of section 125.0104(3)(l) is to permit counties to use tax dollars to finance projects necessary to accomplish the legislature's goal of promoting tourism and economic development.
[11] In Linscott, we held that a "public purpose" is satisfied where "the public interest, even though indirect, is present and sufficiently strong. Of course, public bodies cannot appropriate public funds indiscriminately, or for the benefit of private parties, where there is not a reasonable and adequate public interest." 443 So.2d at 101 (citation omitted) (quoting State v. Housing Fin. Auth., 376 So.2d 1158, 1160 (Fla.1979)). Examples of valid "public purposes" rather broadly include an on-site road improvement project within a unit of a water control district, see Northern Palm Beach County Water Control Dist., 604 So.2d at 443, the construction of an office building for a multistate insurance company, see Linscott, 443 So.2d at 101, and the purchase of mortgages from private homeowners to alleviate shortage in public housing, see State v. Housing Fin. Auth. of Polk County, 376 So.2d 1158 (Fla.1979).
[12] This Court also held that the trial court erred in declining to validate the bonds because, having found a paramount public purpose to exist, the trial court was not permitted to "micromanage the arms-length business negotiations of the parties by striking discrete portions of a complex arrangement." Id. at 679.
[13] The State's arguments against the propriety or completeness of the development and operating agreement are collateral matters which are beyond the scope of this validation proceeding. See State v. Sunrise Lakes Phase II Special Recreation Dist., 383 So.2d 631, 633 (Fla.1980) (holding that trial court does not have jurisdiction to consider validity of operating contract for recreational facility because contract involves other parties and is collateral to bond validation proceeding). Likewise, the State's argument that the County failed to comply with the SEC's disclosure requirements is collateral to the issue of validation. The statute makes no reference to any matters beyond the conditions precedent to issuing bonds and the necessary allegations in the complaint. Therefore, the issues of whether the County should comply and has complied with SEC rule 15c2-12 is beyond the scope of these validation proceedings. See id.; Broward County, 515 So.2d at 1274; Taylor, 498 So.2d at 425.