789 So.2d 268 (2001)
STATE of Florida, Appellant,
v.
JEA, Appellee.
No. SC00-2183.
Supreme Court of Florida.
April 12, 2001.
*269 Harry L. Shorstein, State Attorney, and Michelline Haynes and Tom Kimbrel, Assistant State Attorneys, Jacksonville, FL, for Appellant.
Richard A. Mullaney, General Counsel and Edward C. Tannen, Assistant General Counsel, Office of General Counsel of the City of Jacksonville, Jacksonville, FL; and Paul R. Regensdorf of Akerman, Senterfitt & Eidson, P.A., Fort Lauderdale, FL, for Appellee.
PER CURIAM.
The State of Florida appeals a circuit court judgment validating a proposed bond issue. We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. We affirm.

I. FACTS
In 1997, the JEA (formerly known as the Jacksonville Electric Authority), a body politic and corporate of the City of Jacksonville created pursuant to chapter 92-341, Special Acts, Laws of Florida, entered into a Strategic Alliance ("Alliance") with two municipal utilities, the Municipal Electric Authority of Georgia ("MEAG") and the South Carolina Public Service Authority ("Santee Cooper"). The purpose of the Alliance was to allow its members to compete more effectively in the changing electric utility market. Through the Alliance, JEA, MEAG, and Santee Cooper ("original members") have coordinated the operation of their electric generating facilities and the purchase and sale of electric capacity and energy.
To implement their undertaking, the original members organized The Energy Authority, Inc. ("TEA"), a Georgia nonprofit membership corporation which does not issue capital stock. Under TEA's articles of incorporation and bylaws, TEA has the following marketing options: (a) TEA may buy surplus electric capacity and energy from one or more of its members for sale to one or more of its members; (b) TEA may buy electric capacity and energy from one or more third parties for sale to one or more of its members; (c) TEA may buy electric capacity and energy from one or more of its members for sale to one or *270 more third parties; and (d) TEA may buy electric capacity and energy from one or more third parties for sale to one or more third parties.
After TEA's formation, several other utilities, which are either municipally owned or are themselves political subdivisions, have become members. It is contemplated that only municipally owned utilities and utilities that are political subdivisions will become members of TEA.[1] Additionally, TEA has entered into what it terms "resource management arrangements" with other municipally owned or political subdivision utilities, and TEA is exploring the possibility of entering into resource management arrangements with non-municipal or non-political subdivision utilities.
Each utility that enters into a resource management arrangement with TEA is termed a "resource management partner" and TEA acts as the exclusive agent for that partner in purchasing needed capacity and energy from members or third parties and in selling excess capacity and energy to other members or third parties. These services, which TEA renders for a fee, are similar to the services TEA provides for its members. Resource management partners have a contractual relationship with TEA with no voting or other membership rights. It is anticipated that arrangements with non-municipal or non-political subdivision utilities will represent only a limited portion of TEA's business, i.e., no more than twenty percent of annual revenues.
To provide financial support for TEA and entice third parties to trade with TEA, each of the current members has signed a trade and bank guarantee ("TEA guarantee") pursuant to which the member is obligated to pay amounts owed by TEA to the extent not paid by TEA. The TEA Guarantees embrace transactions entered into on behalf of TEA's members and resource management partners. To the extent that non-municipal or non-political subdivision utilities may become resource management partners, the original and other members would be obligated to pay amounts owed by TEA with respect to transactions entered into on behalf of such partners.
On June 6, 2000, JEA adopted a resolution authorizing issuance of Electric System Subordinated Revenue Bonds in an amount not to exceed $15,000,0000 to finance JEA's obligations under the TEA Guarantees. The circuit court validated issuance of the bonds, finding that JEA's obligations under its TEA Guarantees did not run afoul of article 7, section 10, Florida Constitution. The State appealed and argues that JEA's agreement to guarantee amounts arising from transactions entered into on behalf of non-municipally owned or non-political subdivision utilities belies the circuit court's characterization of TEA as a mere instrumentality of the state. We disagree.
A trial court's ruling in a bond validation proceeding comes to this Court clothed with a presumption of correctness as to all fact-based issues.[2] Our review in such cases is limited to three issues: "(1) *271 whether the public body has the authority to issue bonds; (2) whether the purpose of the obligation is legal; and (3) whether the bond issuance complies with the requirements of the law."[3] In the instant case, only the second issue, i.e., whether the purpose of the obligation is legal, is in dispute by the parties.

II. "SECTION 10"
Article 7, section 10, Florida Constitution, sets forth circumstances under which the state may not pledge its credit:
SECTION 10. Pledging credit. Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person ....
Art. VII, § 10, Fla. Const. (emphasis added).
In the present case, the circuit court ruled as follows on the State's section 10 claim:
A. Plaintiff's obligations under its TEA Guarantees to guarantee TEA's obligations to third parties (including those arising out of transactions entered into for non-municipally-owned or nonpolitical subdivision utilities) to the extent amounts owed by TEA are not paid by TEA when due are not violative of the prohibition contained in Article VII, Section 10 of the Florida Constitution since, although TEA is not a political subdivision of any state it should, for purposes of Article VII, Section 10 of the Florida Constitution, be viewed as an instrumentality of its members, all of whom are political subdivisions and, therefore, TEA is not included within the terms "corporation, association, partnership or person" within the meaning of Article VII, Section 10 of the Florida Constitution.
In support of its argument that TEA does not come within the terms of section 10, JEA points to a published opinion of the Florida Attorney General advising the City of Lakeland that it could enter into a reciprocal insurance association.[4] Under the proposed arrangement there, the reciprocal insurance association was to consist entirely of municipalities and would transact business as a legal entity. The members of the association (i.e., the municipalities) were to agree to indemnify each other for designated risks of loss. The Attorney General found no impediment under section 10 to Lakeland's participation in the association:
The statement of facts submitted in your request indicates that membership in the proposed reciprocal association will be limited to Florida municipalities. In view of that, it is my opinion that no violation of s.10, Art. VII, State Const., would result from the joinder of such municipalities in a reciprocal insurance association or from the contribution of city funds to the required surplus of the insurance fund.
Political subdivisions of the state, including municipalities, are not associations, persons, or corporations to which the proscription of s.10, Art. VII ... applies.
Likewise, the fact that the cities will contribute to the required expendable surplus of the reciprocal insurance association and, in effect, become joint owners *272 of an association which is not itself a municipality would not constitute a violation of s.10, Art. VII ... under the facts presented in your inquiry. The proposed association would not constitute a private association, one having no official duties or concern with the affairs of government and organized primarily for the personal emolument of its members. Rather, the association would be in the nature of a public or quasi-public entity organized primarily to discharge duties to the public or to provide a governmental benefit.

Op. Atty. Gen. Fla. 77-113 (1977) (emphasis added) (citations omitted).
In the present case, TEA appears to be analogous to the above reciprocal insurance association. All TEA's members are municipal utilities and no utility that is a non-municipal or non-public subdivision utility will be permitted to become a TEA member. Although TEA is authorized to enter into resource management arrangements with non-municipal or non-political subdivision utilities, resource management partners have no voting or membership rights in TEA. Further, these resource management arrangements are expected to comprise only a fraction of TEA's business. While JEA's obligations under the TEA guarantees could be called upon by third parties, the vast majority of those guarantees involve municipal or political subdivision utilities. Finally, the guarantees are promulgated in furtherance of TEA's public purposes.
Based on the foregoing, the circuit court reasonably concluded that TEA is more appropriately characterized as an "instrumentality of its members," all of whom are municipally owned or political subdivision utilities, rather than a "corporation, association, partnership or person" within the terms of section 10.

III. "PARAMOUNT PUBLIC PURPOSE"
Even if TEA did fall within the section 10 prohibition as a "corporation, association, partnership or person," the bonds still could be validated if they serve a paramount public purpose. This Court explained:
If the County has not exercised its taxing power or pledged its credit, the obligation must merely serve a public purpose. On the other hand, if the County has used either its taxing power or pledge of credit to support the issuance of the bonds, the purpose of the obligation must serve a paramount public purpose and any benefits to a private party must be incidental.

State v. Osceola County, 752 So.2d 530, 536 (Fla.1999) (emphasis added).[5]
We consistently have held that an incidental private benefit is not sufficient to negate the public character of a project:
Running throughout this Court's decisions on paramount public purpose is a consistent theme. It is that there is required a paramount public purpose with only an incidental private benefit. If there is only an incidental benefit to a private party, then the bonds will be validated since the private benefits "are not so substantial as to tarnish the public character" of the project. If, however, the benefits to a private party are *273 themselves the paramount purpose of a project, then the bonds will not be validated even if the public gains something therefrom.
Orange County Ind. Dev. Auth. v. State, 427 So.2d 174, 179 (Fla.1983) (citations omitted).
In the present case, the circuit court found that TEA issued its guarantees to entice third parties to trade with TEA so that TEA will be better equipped to compete in the wholesale energy market and to ensure access to a larger supply of energy and capacity for its members, all of whom are municipally owned or political subdivision utilities. Further, as previously noted, JEA's obligations under its TEA Guarantees apply to all the transactions entered into by TEA. Of those transactions, the resource management arrangements with non-municipally owned or nonpolitical subdivision utilities would account for only a fraction of TEA's revenues. Accordingly, to the extent that private entities are benefitted by these guarantees, such a benefit is incidental to the paramount public purpose served by TEA.[6]

IV. CONCLUSION
Based on the foregoing, we agree with the trial court's conclusion that TEA constitutes an instrumentality of its members, all of whom are municipally owned or political subdivision utilities. TEA thus is not a "corporation, association, partnership or person" within the meaning of article 7, section 10, Florida Constitution. We further agree that issuance of the JEA bonds serves a paramount public purpose. Accordingly, we affirm the trial court's decision validating the bond issue.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, PARIENTE and LEWIS, JJ., concur.
ANSTEAD and QUINCE, JJ., concur in result only.
NOTES
[1] Article 3 of TEA's bylaws provides, in pertinent part:

As a condition of membership in the corporation, an organization must be a governmental instrumentality which is (i) a political subdivision or (ii) a public utility described in Section 115 of the Internal Revenue Code of 1986, as amended; and any member of the corporation which ceases to be such a governmental instrumentality shall cease to be a member of the corporation.
[2] See State v. Osceola County, 752 So.2d 530, 533 (Fla.1999).
[3] Osceola County, 752 So.2d at 533; see also State v. Inland Prot. Fin. Corp., 699 So.2d 1352, 1355 (Fla.1997); Poe v. Hillsborough County, 695 So.2d 672, 675 (Fla.1997).
[4] See Op. Att'y Gen. Fla. 77-113 (1977).
[5] See also Poe v. Hillsborough County, 695 So.2d 672, 676-77 (Fla.1997) ("[I]f an undertaking is for public purposes, Article IX, § 10 of the Constitution is not violated even though some private parties may be incidentally benefited."); N. Palm Beach County Water Control Dist. v. State, 604 So.2d 440, 442 (Fla. 1992) ("If either [the District's taxing power or pledge of credit] is involved, then the improvements must serve a paramount public purpose.").
[6] Cf. Orange County Indep. Dev. Auth. v. State, 427 So.2d 174 (Fla.1983) (finding a paramount private purpose in the county's issuance of bonds to purchase and construct a television station for a private corporation where the corporation would enjoy substantial benefits over the life of the bonds with only incidental benefits to the public); O'Neill v. Burns, 198 So.2d 1 (Fla.1967) (finding bonds to be issued by State for the creation of headquarters for nonprofit corporation did not serve paramount public purpose as the purported benefits to be derived by the public from the expenditure, i.e., promotion of tourism, were incidental); State v. Town of North Miami, 59 So.2d 779 (Fla.1952) (affirming the circuit court's invalidation of bonds issued by town to purchase lands and construct a manufacturing to be leased to private corporation where the renewal and options to buy granted the corporation in the lease essentially granted the corporation a substantial benefit).